**FILED**



**2:20 pm, 3/31/20**

**Margaret Botkins
Clerk of Court**

Weston W. Reeves, 4-1120
Anna Reeves Olson, 6-3692
PARK STREET LAW OFFICE
242 S. Park Street
Casper, Wyoming 82601
(307) 265-3843
(307) 235-0243 *facsimile*
wwr@parkstreetlaw.com
aro@parkstreetlaw.com
*Attorneys for Plaintiff*

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF WYOMING

| | |
|---|---|
| GRACIE ANN FORTH, | ) |
| | ) |
|      Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) Civil No. <u>20-CV-53-ABJ</u> |
| | ) |
| LARAMIE COUNTY SCHOOL DISTRICT No. 1 | ) |
| and John/Jane Does 1-10 in his/her official | ) |
| capacity, | ) |
| | ) |
|      Defendants. | ) |

## COMPLAINT

The Plaintiff, Gracie Forth, by and through her attorneys, state as follows:

### JURISDICTION & VENUE

1. This Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. §§ 1331

   and 1343 because this litigation involves matters of federal law, specifically claims made

   under the Education Amendments of 1972 (Title IX), 20 U.S.C. § 1681 *et seq.* and the

   Fourteenth Amendment to the United States Constitution made actionable pursuant to 42

   U.S.C. § 1983 and §1988.

2.  This Court has jurisdiction pursuant to 42 U.S.C § 1988, Title IX and § 2000d *et seq*., to award attorneys' fees and other costs of representation to the Plaintiff.

3.  Venue is proper in this District pursuant to 28 U.S.C § 139l(b)(2) because the events and omissions giving rise to the claim occurred in this District.

THE PARTIES

4.  Gracie Forth ("Ms. Forth") is a resident of Laramie County, Wyoming and was a resident of Laramie County during all relevant times.

5.  Defendant Laramie County School District #1 (LCSD #1) is a unified school district and board organized under the laws of the State of Wyoming providing educational opportunities to eligible students in Laramie County.

6.  During all relevant times, LCSD #1 employed Joseph Kent Meza ("Meza") as a seventh-grade math teacher allowing him access to minor students, including Ms. Forth.

7.  John and Jane Does 1-10 are as yet unidentified administrators, officials, board members, employees, agents, or persons otherwise affiliated with LCSD #1 who violated Ms. Forth's constitutional rights and were acting within the scope of his/her duties and under color of state law.

GENERAL ALLEGATIONS

8.  Plaintiff incorporates paragraphs 1 through 7 above by reference as though fully restated herein.

9.  At all relevant times, Joseph Meza was an adult male residing in Laramie County, Wyoming.

10. On May 1, 2012, Meza applied to work as a seventh-grade math teacher at Johnson Junior High School, located in Cheyenne, Wyoming.

2

11. After Meza submitted his application, John Lyttle, Assistant Superintendent of Human Resources at that time, sent a "Reference Check" to one of Meza's references. The Reference Check warned Lyttle that while Meza "works well with kids," he also tended to be "too close to students."

12. Upon information and belief, Lyttle did not conduct any follow-up investigation in order to discover what was meant by Meza being "too close to students."

13. On May 30, 2012, Lyttle offered Meza the full-time mathematics teaching position at Johnson Junior High School. Meza was assigned to work with the seventh-grade students.

14. Shortly thereafter, Meza was also employed as a Johnson Junior High Track Coach.

15. Meza worked at Johnson Junior High from the fall of 2012 until the spring of 2013 when he was re-hired to work at Johnson Junior High in the same position from 2013 to 2014.

16. Meza's tendency to be "too close" with the young female students at Johnson Junior High was evident by at least Fall 2013. At a school football game on September 29, 2013, Johnson Junior High Principal John Cunningham witnessed Meza sitting with a "number of 7th grade girls." One of these girls was sitting with her arm around Meza and continually touching his face and neck. This conduct is prohibited by the Wyoming Professional Teaching Standards Board's Professional Conduct Guide ("Wyoming Professional Conduct Guide"). *See* Ex. A. Upon information and belief, the Wyoming Professional Conduct Guide had been adopted by LCSD #1 by 2013.

17. Cunningham counseled Meza that such conduct was inappropriate and the need for boundaries and personal space with these students. A letter regarding this event was placed in Meza's personnel file.

18. Upon information and belief, LCSD #1 did not conduct an investigation into the matter. Rather, Meza was hired to work "extended hours" in October 2013.

19. In the fall of 2013, Ms. Forth was enrolled at Johnson Junior High School as a seventh-grade student. Ms. Forth was thirteen years old.

20. Meza was assigned as Ms. Forth's seventh-grade math teacher.

21. Prior to entering seventh grade, Ms. Forth's grades were primarily As and Bs. She had limited absences and tardiness.

22. In November/December 2013, while Ms. Forth was Meza's student, Meza learned Ms. Forth had been sexually assaulted. Meza called Ms. Forth's personal cell phone from another student's phone. Meza used his position of authority to contact Ms. Forth's mother under the guise of mentoring and tutoring Ms. Forth with her schoolwork. Meza asked for permission to contact Ms. Forth's cell phone directly so that he could arrange times to meet with Ms. Forth, including after school and on weekends. This conduct is prohibited by the Wyoming Professional Conduct Guide. Ex. A.

23. Meza began texting Ms. Forth at all times of the day and night. Meza and Ms. Forth were texting each other throughout the school day, on school grounds, while Ms. Forth was in class. This conduct is prohibited by the Wyoming Professional Conduct Guide. Ex. A.

24. Messages from Meza were sent under the screen name "shootingstar0606" and Ms. Forth's screen name was "Grassie2107."

25. By the early spring semester of 2014, Ms. Forth was spending much more time with Meza at school:

    a. Two or three times per week, Ms. Forth was in Meza's classroom before school began.

    b.  Ms. Forth ate lunch every day in Meza's classroom rather than in the cafeteria with other students.

    c.  Meza frequently closed the door so that they would have additional "privacy."

    d.  Meza drove Ms. Forth home from school.

    e.  Ms. Forth began skipping other classes to see Meza. Ms. Forth asked for hall passes specifically so that she could go to Meza's room. This generally occurred during Meza's office hour time so that they could be alone in his classroom. On other occasions, Ms. Forth sat behind Meza's desk when he was teaching other students.

26. Much of the above conduct is prohibited by the Wyoming Professional Conduct Guide. Ex. A.

27. In March 2014, Meza applied to and was hired to teach summer school.

28. Meza encouraged Ms. Forth to participate in cross-country running and track as he was the coach and/or assistant coach for those activities. Meza and Ms. Forth also formed a running club which consisted of Meza, Ms. Forth, one other LCSD #1 employee and a couple of other students. These were all school-related activities.

29. As Meza and Ms. Forth spent more time together, their text messages and interactions with each other, on and off of school property became increasingly inappropriate and flirty.

30. In May 2014, Meza used his position of authority to ask Ms. Forth to take their friendship to the "next level" and start dating. This conversation took place in Meza's classroom, during school hours.

31. Unsure, Ms. Forth requested time to think about it.  Meza appeared offended and began acting differently, which frightened Ms. Forth because he was her teacher and giving her special attention.

32. The next morning before school started, Ms. Forth went to see Meza while he was playing wiffle ball on school grounds and agreed to begin a romantic relationship.

33. Meza and Ms. Forth began spending even more time together at school and on the weekends in violation of the Wyoming Professional Conduct Guide.  Ex. A.

34. Meza purported to be Ms. Forth's tutor and mentor.

35. In the summer of 2014, Ms. Forth enrolled in Meza's class for summer school.

36. Their inappropriate and illegal abusive relationship progressed and included kissing, hugging and physical touching resulting in sexual stimulation, which occurred in, on and around Cheyenne, specifically including LCSD #1 property, including but not limited to Johnson Junior High School and South High School, both during and outside of regular school hours.

37. In the summer of 2014, Ms. Forth had sexual intercourse with Meza for the first time when Meza took Ms. Forth to his home after summer school classes.  Ms. Forth was fourteen years old.  Meza was thirty-one years old.

38. During all relevant time periods, Ms. Forth was emotionally and legally incapable of consenting to a sexual relationship with Meza.

39. The following school year (Fall 2014 – Summer 2015), even though Ms. Forth was no longer Meza's student, Ms. Forth continued to spend excessive amounts of time with Meza on school grounds:

    a.  Ms. Forth was with Meza every day before school, either in his classroom or during an outside activity.

b.  Weather permitting, Ms. Forth watched Meza play wiffle ball on school property with other students and teachers every morning on school property, though she did not participate in the game.

c.  On May 21, 2015, Ms. Forth described the attention that she was giving to Meza at school via text message: "At wiffle ball I winked at you; I tried to slap your butt; randomly in a middle of a conversation I said 'Oh and your sexy'; I blew you a kiss before I went to wiffle ball."

d.  Ms. Forth spent her lunch hour in Meza's classroom rather than in the cafeteria with other students.

e.  Ms. Forth continued obtaining "hall passes" daily so that she could spend extra time in Meza's classroom.

f.  During school hours, Ms. Forth routinely went outside with Meza's class to watch him play nine square even though she was not in his class and did not play the game with them.

g.  Ms. Forth was in Meza's classroom every day after school.

h.  Meza continued to drive Ms. Forth home from school.

40. During the 2014-2015 school year, when Ms. Forth was in eighth grade, she began spending the night at Meza's house.

41. Much of the above conduct is prohibited by the Wyoming Professional Conduct Guide. Ex. A.

42. The inappropriate and illegal abusive relationship continued daily throughout the 2014 to 2015 school year. Meza and Ms. Forth continued to exchange text messages, both during and after school hours. Meza continued to kiss, hug and inappropriately touch Ms. Forth

in his classroom after school. After school, Meza drove Ms. Forth to his home where they would have sexual intercourse.

43. Prior to the end of the 2014-2015 school year, Meza made plans to ensure he and Ms. Forth would continue to see each other during the summer in Summer School. On May 21, 2015, Ms. Forth texted Meza, "Well [sic] have a lot of time after school. At summer school. It will be nice." Meza responded "I know."

44. Thus, the pattern of sexual abuse continued during the summer of 2015 as Meza continued working with Ms. Forth at summer school and coaching her with track and running training. Meza further continued to act under the guise of being Ms. Forth's tutor and mentor.

45. From Fall 2015 – Spring 2017, Ms. Forth was enrolled in South High School, but continued to visit Meza at Johnson Junior High nearly every day before school, during lunch and after school and continued participating with him in extra-curricular school sponsored running activities.

46. From 2014-2017, the sexual abuse against Ms. Forth by Meza continued both on and off of school property.

47. In addition to sexual assaults against a minor by a person in a position of authority, Ms. Forth suffered severe mental and emotional anguish as a result of this contact with Meza. As a fourteen-year-old, Ms. Forth was incapable of consenting to or dealing with a sexual relationship with her teacher. Meza was controlling and emotionally abusive to Ms. Forth. Meza increasingly isolated Ms. Forth from others and became angry and jealous if she spoke with boys her own age. Meza also blamed Ms. Forth for interfering with his relationship with family members and told Ms. Forth it was her fault that he didn't see his grandmother before she died.

48. Meza similarly caused severe mental anguish and emotional distress to Ms. Forth by threatening to commit suicide if Ms. Forth ended their relationship.

49. Ms. Forth engaged in numerous acts of self-harm, including cutting herself and attempting to commit suicide.  Ms. Forth was hospitalized for two days after the suicide attempt.

50. In November 2016, Ms. Forth believed she was pregnant with Meza's child.  Meza took Ms. Forth to America's Express Urgent Care in Cheyenne, Wyoming for treatment and a pregnancy test.  Ms. Forth was not pregnant but did have a urinary tract infection.

51. The abusive relationship and emotional trauma caused Ms. Forth's removal from school and her performance to suffer.

52. During 2014-2017, Ms. Forth and Meza were absent from school together so that Meza could continue his sexually abusive relationship with Ms. Forth.

53. During 2014-2016, Ms. Forth daily obtained hall passes to spend time in Meza's class and thus did not receive the required education in those courses.  A pattern of writing passes to a particular student such as Ms. Forth is a violation of the Wyoming Professional Conduct Guide.  Ex. A.

54. From 2014-2017, Meza and Ms. Forth exchanged thousands of text messages both during and outside of the school day.

55. From 2014-2017, Ms. Meza gave Ms. Forth the correct answers to standardized math examinations.

56. Between 2013-2017, John Cunningham, John Balow, Brian Cox and/or Christina Hunter were employed by LCSD #1 as Principals and/or Assistant/Associate Principals of Johnson Junior High (collectively "JJH Principals") and were acting under color of state

law.  At all relevant times, JJH Principals had authority over Meza.  At all relevant times, Hunter had a supervisory role over Meza that included evaluating and supervising Meza.

57. Between 2013-2017, John Lyttle, W. Matt Strannigan, and Marc Lahiff were employed by LCSD #1 as Assistant Superintendent Human Resources (collectively "HR Superintendents") and were acting under color of state law.

58. Throughout 2014-2017, JJH Principals repeatedly observed Ms. Forth in Meza's classroom and with Meza, even though she had not been Meza's student since May 2014 and had not attended Johnson Junior High since May 2015.

59. Additionally, Johnson Junior High employees saw and commented on the extraordinary amount of time Ms. Forth was spending with Meza before, during, and after school.

60. During the 2014-2015 school year, Hunter entered Meza's classroom while he was teaching class and saw Ms. Forth, in eighth grade at the time and not enrolled in Meza's class, sitting at Meza's desk.  Hunter instructed Ms. Forth to go back to her class and then counseled Meza that students who are not enrolled in his class cannot be in his classroom.

61. On April 14, 2015, Balow and Hunter met with Meza to address concerns they had regarding students who were not enrolled in his class being present in his classroom.  At that meeting, they explained "concerns and perceptions" that could develop amongst students and staff about the students frequently visiting the classroom. Balow and/or Hunter spoke with Meza approximately once per month regarding these issues.

62. These incidents were not documented, or if they were, the documentation was not placed in Meza's personnel file.  Upon information and belief, LCSD #1 did not conduct an investigation(s) into the matters.  However, the events were significant enough that several years later, in July 2017 after Meza's arrest, Hunter documented these incidents, pinpointing the April 15, 2015 date, and placed a letter in Meza's personnel file.

63. Hunter was aware that Ms. Forth was spending a lot of time in Meza's room. Hunter frequently told Ms. Forth that she needed to return to class. Hunter verbally counseled Meza about his boundaries with students. Hunter spoke with Meza about touching students, being in the same room as Ms. Forth with or without the door closed, not sitting too close to students or being in a student's personal space. Hunter frequently singled out Ms. Forth. Hunter warned Meza to be careful about the perceptions that could develop based on his actions and closeness. Other employees warned Meza about the time he was spending with Ms. Forth and warning him "You know what this looks like, right?".

64. Students reported that Ms. Forth and Meza were engaging in inappropriate behavior such as sharing drinks together.

65. Teachers observed Ms. Forth with Meza at school on weekends.

66. When Ms. Forth was in eighth grade, Ms. Forth and Meza began traveling together to run races. In May 2015, Memorial Day weekend, Meza and Ms. Forth traveled to Boulder, Colorado to run the Boulder Bolder. Over the next eighteen months, they continued to run races at locations in Colorado, Florida, Illinois, Minnesota and Nevada. They had intercourse on all of these trips.

67. Ella Parish, a teacher at Johnson Junior High, accompanied Meza and Ms. Forth on one of the running trips. While Ms. Parish was out at night, Ms. Forth had intercourse with Meza in his hotel room. Ms. Parish now intends to marry Meza.

68. Upon information and belief, rumors circulated about Ms. Forth and Meza having a sexual relationship.

69. Upon information and belief, at least one employee at Johnson Junior High repeatedly notified and reported concerns about Meza's inappropriate relationship with Ms. Forth to JJH Principals.

70. The behavior described within this Complaint, including but not limited to paragraphs 16, 22, 23, 25, 29, 30, 33, 36, 37, 39, 40, 42-42, 52-55, 60, 63-66, 76, and 92 constitute violations of the Wyoming Professional Conduct Guide. *See* Ex. A.

71. No action was taken to investigate the reports and concerns about the inappropriate relationship. No action was taken to investigate the observations made JJH Principals. No action was taken to determine whether Ms. Forth was being sexually abused by Meza, despite the statements to Meza about the perceptions surrounding his closeness to Ms. Forth. Neither Meza nor Ms. Forth were questioned about their relationship.

72. Meza was never disciplined for the continued presence of Ms. Forth with him before, during and after school and repeated violations of school policy and the Wyoming Professional Conduct Guide.

73. Ms. Forth's parents were never notified about the relationship between Ms. Forth and Meza.

74. The sexual and emotional abuse of Ms. Forth continued.

75. At some point, Meza decided he wanted to adopt Ms. Forth. Meza contacted Marc Lahiff, Assistant Superintendent of Human Resources, regarding the school district's position, policy and/or concerns about adopting Ms. Forth. Lahiff, on behalf of the District, did not express concerns or inquire into the proposed adoption.

76. In October 2015, Ms. Forth moved into Meza's home. The sexual abuse continued after Ms. Forth moved into Meza's home.

77. The adoption was not complete until May 2016, a full seven months after Ms. Forth had moved into her teacher's home.

78. At no time did LCSD #1 contact either of Ms. Forth's parents, one of whom lived in Cheyenne, Wyoming, regarding the potential adoption. LCSD #1 did not contact Ms.

Forth's parents regarding Ms. Forth living with her teacher and advisor. LCSD #1 did nothing to investigate the strange inquiry by Meza to adopt a student who was currently residing with her mother. LCSD #1 did not nothing to prevent Ms. Forth from moving in with her teacher.

79. At all relevant times, JJH Principals were LCSD #1 officials with the ability to remedy Meza's misconduct. The LCSD #1 officials had sufficient knowledge that Meza presented a substantial risk of abuse to Ms. Forth but were deliberately indifferent to the risk.

80. Based on LCSD #1's failure to act, Ms. Forth continued to be subject to the inappropriate and illegal abusive relationship.

81. During all relevant time periods, Ms. Forth was required to attend school pursuant to WYO. STAT. ANN. § 21-4-102(a).

82. A special relationship exists between LCSD #1 and the students entrusted to LCSD #1's care, including Ms. Forth.

83. On May 26, 2017, Ms. Forth reported the sexual assaults to the Cheyenne Police Department.

84. On July 7, 2017, the Laramie County District Attorney's Office filed an Information, followed by a Second Amended Information on July 14, 2017 alleging six counts of 1st Degree Sexual Abuse of Minor under 18, Position of Authority based upon Meza's position as Ms. Forth's teacher and running club advisor and two counts of 1st Degree Sexual Abuse of Minor under 18, Guardian of Victim.

85. Upon information and belief, Meza remained an employee of LCSD #1 until the end of 2018. Meza was placed on paid administrative leave during that time.

86. On January 11, 2019, Meza was sentenced to 20 to 40 years in prison after pleading Guilty to Count VII -- 1st Degree Sexual Abuse of Minor under 18.

87. Upon information and belief, to date LCSD #l has conducted no investigation into the sexual abuse committed by its employee against a student.

88. Upon information and belief, LCSD #1 never asked Ms. Forth about the relationship between she and Meza, even after he pled guilty to sexually abusing her.

89. Upon information and belief, LCSD #1 failed, at any time, to report the inappropriate and illegal abusive relationship to the Office of Civil Rights.

90. Ms. Forth was not offered services or assistance by LCSD #1 to help her cope with the trauma or remedy the deficiencies in education.

91. As a result of Meza's acts and LCSD #l's actions, inactions and negligence, the inappropriate, abusive and illegal relationship with Ms. Forth resulted in significant injury to Ms. Forth in the form of repeated assault and battery, severe and significant emotional and psychological injury, impaired access to education, and monetary damages including but not limited to medical bills for physical injuries and ongoing counseling and other psychological assessment.

92. LCSD #1, through JJH Principals and Lahiff, had actual knowledge that Meza's conduct, such as providing rides home to Ms. Forth, calling and texting Ms. Forth, failing to leave the classroom door open when Ms. Forth was alone in Meza's room, allowing Ms. Forth to participate in his 7th grade classes when she was not enrolled in 7th grade, socializing with Ms. Forth, taking Ms. Forth on running trips and vacations, having Ms. Forth move into his home several months in advance of adoption, adopting Ms. Forth, and otherwise engaging in unprofessional conduct, was a violation of the LCSD #1 Employee Handbook, the Wyoming Professional Conduct Guide and LCSD #1 policies.

93. LCSD #1, through JJH Principals, knew that Ms. Forth could allege that a sexual relationship existed, but failed to conduct an investigation into the relationship between Ms. Forth and Meza.

94. LCSD #1, JJH Principals and Lahiff possessed the authority and requisite control necessary over the situation to prohibit Meza from seeing Ms. Forth and ending their relationship.

95. LCSD #1, JJH Principals and Lahiff possessed final policymaking authority with respect to Meza's ability to have access to Ms. Forth as a tutor, mentor, running coach and club advisor.  JJH Principals and Lahiff had the ability to discipline, terminate or recommend termination of Meza, and/or place Meza on administrative leave during all relevant times.

96. LCSD #1, through JJH Principals and Lahiff, had notice of the aforementioned unconstitutional acts and misconduct committed by Meza; such misconduct being so widespread and flagrant that in the exercise of its responsibilities, LCSD #1 should have known of the misconduct and unconstitutional acts.

97. During all relevant times, LCSD #1, JJH Principals and Lahiff had the knowledge, power and ability to prevent the inappropriate and illegal abusive relationship between Ms. Forth and Meza and thus the sexual assaults against Ms. Forth, but they willfully ignored and/or were deliberately indifferent to the situation and through their actions and inactions, chose not to act to prevent and/or stop the continued actions.

98. LCSD #1 maintained a custom, policy or pattern of failing to develop administrative policies or afford training, supervision or education for the identification, detection, reporting, and/or investigation of alleged or suspected incidents of sexual harassment and other offensive and unconstitutional acts and misconduct, and failing to maintain an appropriate system of review of sexual abuse and harassment claims.

99. LCSD #1 knew or should have known that their procedures and policies for training, supervising and educating its employees in the detection, reporting and/or investigation of alleged or suspected incidents of harassment and other offensive and unconstitutional acts and misconduct was inadequate and likely to result in the violation of a student's constitutional rights.

100. The discriminatory practices of LCSD #1 and its agents or employees were either malicious or implemented with reckless or deliberate indifference to the federally protected rights of a minor child.

101. The inappropriate and illegal abusive relationship engaged in pursuant to Meza's position of authority as teacher and under the guise of tutoring, mentoring, coaching, and advising constituted sexual harassment of Ms. Forth and a danger to her bodily integrity.  LCSD #1 had notice and knowledge of the inappropriate relationship and had knowledge of the underlying facts indicating a substantial danger to Ms. Forth culminating in sexual assaults, repeated harassment of Ms. Forth and severe mental anguish to Ms. Forth, but failed to reasonably respond to the assaults and repeated harassment.

**COUNT I**

**VIOLATION OF THE EDUCATIONAL AMENDMENTS OF 1972 (TITLE IX), 20 U.S.C. § 1981, *ET SEQ.* AGAINST DEFENDANT LCSD #1**

102. Plaintiff incorporates all preceding paragraphs into this Count by reference as though fully restated herein.

103. LCSD #1 is a recipient of federal funds and was therefore subject to the duties and purposes of Title IX of the Educational Amendments of 1972, 20 U.S.C. § 1681, *et. seq.*

104. Ms. Forth belongs to a protected group under Title IX.

105.  As described herein, Ms. Forth was subjected to sexual harassment and abuse because of her gender.

106.  At all relevant times, JJH Principals and HR Superintendents were district officials who had the responsibility and authority to address the harassment and to institute corrective measures against Meza on Ms. Forth's behalf.

107.  LCSD #1 had knowledge of numerous and repeated reports of Meza's inappropriate behavior and inappropriate relationship with Ms. Forth and harassment of Ms. Forth, both within and outside of school grounds as set forth in the preceding paragraphs.

108.  Upon information and belief, LCSD #1, through JJH Principals and Lahiff, had actual knowledge of underlying facts indicating a substantial danger to Ms. Forth, which constitutes actual notice to LCSD #1 of the inappropriate and illegal abusive relationship between Meza and Ms. Forth and the harassment of Ms. Forth.

109.  By its actions and failure to act after receiving reports of Meza's inappropriate conduct, in which Ms. Forth was subject to harassment that was severe, pervasive and offensive, LCSD #1 acted with deliberate indifference to Ms. Forth's right to a safe and secure education environment by failing to stop the inappropriate and illegal abusive relationship between Meza and Ms. Forth and the harassment of Ms. Forth.

110.  LCSD #1's response and lack of response to the allegations of the inappropriate relationship was clearly unreasonable.

111.  LCSD #1 took no action to rehabilitate Ms. Forth or put her in the same position she had been in prior to the inappropriate and illegal abusive relationship.

112.  LCSD #1 materially impaired Ms. Forth's access to educational opportunities and benefits from LCSD #1 in violation of the requirements of Title IX by, among other things:

a.  Failing to investigate reports of the inappropriate relationship between Ms. Forth and Meza and harassment of Ms. Forth and take action to remedy the discrimination caused thereby;

b.  Failing to question either Meza or Ms. Forth about the relationship;

c.  Failing to take actions required by Title IX to remedy the hostile environment, or being deliberately indifferent thereto;

d.  Failing to take appropriate action based upon preconceptions and stereotypes rampant within and perpetuated by LCSD #1 which resulted in failing to protect a young girl from a man in a position of authority despite actual notice of the inappropriate relationship;

e.  Failing to notify Ms. Forth's parents regarding the relationship, reports about the relationship, and concerns about the relationship;

f.  Failing to adequately train, supervise and educate its employees in the detection, reporting and/or investigation of alleged or suspected incidents of harassment and other offensive and unconstitutional acts and misconduct.

g.  Through other actions, inactions, and deliberate indifference.

113.  LCSD #1, through JJH Principals and Lahiff, had knowledge of underlying facts indicating a substantial danger to Ms. Forth, which constitutes actual notice to LCSD #1, of Meza's discrimination, including grooming and sexual abuse against Ms. Forth and the authority to take corrective action to minimize the harm suffered due to the discrimination, sexual abuse, and harassment, yet refused to do so.

114.  The above actions constitute discrimination against Ms. Forth with respect to education because of her female gender.

115.   LCSD #1 violated its duties and requirements mandated by Title IX by failing to investigate, report, or respond to the abuse, both before and after criminal charges were brought against Meza.

116.   LCSD #1 violated its duties and requirements mandated by Title IX by failing to take any steps whatsoever to bring an end to the discriminatory behavior or reasonably prevent its recurrence.

117.   Upon information and belief, LCSD #1 failed, at any time, to report the inappropriate and illegal abusive relationship to the Office of Civil Rights.

118.   As a direct and natural consequence of LCSD #1's actions, inactions, and deliberate indifference, Ms. Forth's access to education was severely limited as her school performance and grades suffered.

119.   As a direct and natural consequence of LCSD #1's actions, inactions, and deliberate indifference, Ms. Forth's access to education was severely limited because Meza and Ms. Forth missed regularly scheduled school days so that Meza could continue his sexually abusive relationship with Ms. Forth.

120.   As a direct and natural consequence of LCSD #1's actions, inactions, and deliberate indifference, Ms. Forth's access to education was severely limited because Ms. Forth daily received hall passes to spend time in Meza's class and thus did not receive the required education in those courses.

121.   As a direct and natural consequence of LCSD #1's actions, inactions, and deliberate indifference, Ms. Forth's access to education was severely limited because Ms. Forth had numerous absences from school due to mental health issues caused by the sexually and emotionally abusive relationship, including absences due to a suicide attempt by Ms. Forth.

122.   As a direct and natural consequence of LCSD #1's actions, inactions, and deliberate indifference, Ms. Forth's access to education was severely limited because Meza and Ms. Forth exchanged hundreds of text messages during the school day.

123.   As a direct and natural consequence of LCSD #1's actions, inactions, and deliberate indifference, Ms. Forth's access to education was severely limited because Meza gave Ms. Forth answers to standardized math scores from 2014-2017.

124.   As a direct and natural consequence of LCSD #1's actions, inactions, and deliberate indifference, Ms. Forth suffered, and continues to suffer, injuries including, without limitation, emotional distress and psychological trauma.

125.   As a direct and proximate result of LCSD #1's actions, inactions, and deliberate indifference, Ms. Forth sustained, and continues to sustain, injuries for which she is entitled to be compensated, including without limitation:

   a.   Past, present, and future physical and psychological pain, suffering, emotional distress, mental anguish, and loss of enjoyment of life;

   b.   Medical bills, counseling, and other costs and expenses for past and future medical and psychological care;

   c.   Impaired educational capacity;

   d.   Future lost wages;

   e.   Attorney fees and costs;

   f.   Punitive damages as necessary and sufficient to deter LCSD #1 from engaging in the same or similar behavior in the future; and

   g.   Such other and further relief that this Court deems just and proper.

**COUNT II**

**VIOLATION OF MS. FORTH'S CONSTITUTIONAL RIGHT OF EQUAL PROTECTION PURSUANT TO THE FOURTEENTH AMENDMENT OF THE UNITED STATES CONSTITUTION BROUGHT UNDER 42 U.S.C. § 1983 AGAINST DEFENDANT LCSD #1**

126.  Plaintiff incorporates all preceding paragraphs into this Count by reference as though fully restated herein.

127.  Ms. Forth has a constitutional right to equal protection of the law and to be free from harassment based on her sex under the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution.

128.  Between 2013-2017, Meza engaged in a pattern and practice of engaging in inappropriate conduct with female students that violated the LCSD #1 Employee Handbook, the Wyoming Professional Conduct Guide and LCSD #1 policies.  Such conduct included, but is not limited to, the following conduct directed at Ms. Forth and other female students:

   a.  Engaging in inappropriate touching and contact with female students, both in the classroom and at school sponsored extra-curricular activities;

   b.  Allowing only female students to regularly spend extended periods of time in Meza's classroom during lunch periods;

   c.  Allowing female students who were not in his class to spend extended periods of time in his classroom;

   d.  Leaving the door to his classroom closed while female students/former students were present in his class during non-class hours;

   e.  Contacting female student(s) on their personal cell phones from his personal cell phone;

      f.  Inappropriately injecting himself into personal relationships between his female students and their significant others;

      g.  Contacting parents and school administrators to set up an "intervention" regarding at least one relationship between a female student and her boyfriend in an attempt to get her to break up with her boyfriend;

      h.  Staging an intervention with the student and another teacher to get her to break up with her boyfriend.

129.    At all relevant times, JJH Principals Cunningham, Balow, Cox and Hunter were employed by LCSD #1 and acting under color of state law. As such, JJH Principals were final policymakers and decision makers with respect to the claims set forth below, and their actions constitute the actions of LCSD # 1.

130.    At all relevant times, HR Superintendents Lyttle, Strannigan, and Lahiff were employed by LCSD #1 and acting under color of state law. As such, they were final policymakers and decision makers with respect to the claims set forth below, and their actions constitute the actions of LCSD # 1.

131.    JJH Principals and HR had the power and authority to enact and enforce policies and practices related to a teacher's contact with students, inappropriate conduct with students, and boundaries.

132.    JJH Principals and HR had supervisory roles and authority over Meza, including authority over disciplinary measures, placing Meza on administrative leave, offering Meza teaching contracts for the school year, offering Meza teaching contracts for summer school, offering Meza contracts to work extended hours, offering Meza contracts to coach extra-curricular activities, and recommending that Meza's that contracts be renewed or terminated.

133.   JJH Principals and HR had control over Meza's access to Ms. Forth as tutor, mentor, track and cross-country coach and running club advisor and control over the continued access to Ms. Forth when she was no longer Meza's student, including the ability to prohibit such continued access.

134.   JJH Principals had a duty to ensure that LCSD #1 students had access to a safe and secure learning environment.

135.   LCSD #1, through JJH Principals and/or Lahiff, had notice and knowledge that Meza was engaged in conduct that was harassing and posed a pervasive and unreasonable risk of constitutional injury to Ms. Forth as set forth above in the preceding paragraphs.

136.   Meza's conduct was so widespread and pervasive that LCSD #1's failure to investigate, prevent and terminate the harassment, through both the complaints received by JJH Principals and their own observations, was so inadequate as to demonstrate it was deliberately indifferent to, tacitly authorized and/or acted in reckless disregard to the repeated harassment and sexual assaults of Ms. Forth by Meza.

137.   LCSD #1's actions, inactions and omissions allowed the sexual assaults and harassment to begin and continue, where they could have been prevented and/or stopped, thus violating Ms. Forth's constitutional right to equal protection.  By failing to take any action to prevent the sexual assaults and harassment, LCSD #1 consciously acquiesced in the continued harassment.

138.   LCSD #1 failed to investigate reports of the relationship and abuse, both before and after criminal charges were brought against Meza.

139.   LCSD #1 failed, at any time, to notify Ms. Forth's parents of complaints or concerns about the inappropriate and illegal abusive relationship.

140. LCSD #1 repeatedly failed to follow its procedures and policies as outlined in the LCSD #1 Employee Handbook and the Wyoming Professional Conduct Guide.

141. Upon information and belief, LCSD #1 failed, at any time, to report the inappropriate and illegal abusive relationship to the Office of Civil Rights.

142. LCSD #1 failed, at any time, to address any of the violations of the Wyoming Professional Conduct Guide demonstrated by the behavior described within this Complaint, including but not limited to paragraphs 16, 22, 23, 25, 29, 30, 33, 36, 37, 39, 40, 42-42, 52-55, 60, 63-66, 76, and 92.

143. The foregoing demonstrates that LCSD #1 maintained a custom and practice of failing and/or refusing to investigate complaints of sexual harassment against its students despite, during the same timeframe as Meza's abuse against Ms. Forth, another teacher being arrested for sexual abuse of a former student (March 2014) and pleading *nolo contendre* in August 2015 to charges of Second Degree Sexual Abuse of a Minor pursuant to Wyo. Stat. § 6-2-315(a)(i) and Third Degree Sexual Abuse of a Minor pursuant to Wyo. Stat. § 6-2-316(a)(i). *See generally B.A.L., by and through his guardian and next friend, Jon Stephenson v. Laramie County School District No. 1, et. al.,* Civ. Action No. 16-CV-00091-SWS (D. Wyo. 2016); *see also Pl.'s First Amended Complaint,* Docket No. 52, ¶¶ 17, 45, 55, 69, 81, 93, 101, 104, 114, 117.

144. LCSD #1 further maintained a custom and practice of failing and/or refusing to notify parents about complaints of and concerns about sexual harassment against its students. *Id.* at ¶¶ 24, 26-28.

145. As a direct and proximate result of LCSD #1's actions, inactions, and deliberate indifference, Ms. Forth sustained, and continues to sustain, injuries for which she is entitled to be compensated, including without limitation:

a.  Past, present, and future physical and psychological pain, suffering, emotional distress, mental anguish, and loss of enjoyment of life;

b.  Medical bills, counseling, and other costs and expenses for past and future medical and psychological care;

c.  Impaired educational capacity;

d.  Future lost wages;

e.  Attorney fees and costs;

f.  Punitive damages as necessary and sufficient to deter LCSD #1 from engaging in the same or similar behavior in the future; and

g.  Such other and further relief that this Court deems just and proper.

## COUNT III

### VIOLATION OF MS. FORTH'S CONSTITUTIONAL RIGHT OF SUBSTANTIVE DUE PROCESS PURSUANT TO THE FOURTEENTH AMENDMENT OF THE UNITED STATES CONSTITUTION BROUGHT UNDER 42 U.S.C. § 1983 - DANGER CREATION AGAINST DEFENDANT LCSD #1

146.   Plaintiff incorporates all preceding paragraphs into this Count by reference as though fully restated herein.

147.   At all relevant times, JJH Principals Cunningham, Balow, Cox and Hunter were employed by LCSD #1 and acting under color of state law.  As such, JJH Principals were final policymakers and decision makers with respect to the claims set forth below, and their actions constitute the actions of LCSD # 1.

148.   At all relevant times, HR Superintendents Lyttle, Strannigan, and Lahiff were employed by LCSD #1 and acting under color of state law. As such, they were final policymakers and decision makers with respect to the claims set forth below, and their actions constitute the actions of LCSD # 1.

149.   LCSD #1, through JJH Principals, affirmatively acted to allow Meza to begin and continue a relationship with Ms. Forth by allowing Meza continued access to Ms. Forth before, during, and after school in violation of the Wyoming Professional Conduct Guide; by ignoring and/or changing the policy regarding appropriate teacher-student boundaries; by choosing not to investigate observations and reports about the inappropriate relationship between Meza and Ms. Forth; by choosing not to notify Ms. Forth's parents about concerns and/or reports about the relationship; by choosing not to enforce its own policies and procedures prohibiting such conduct with students; and by choosing not to discipline Meza about his failure to maintain appropriate boundaries despite multiple conversations about boundaries, all of which allowed Meza to groom, begin and continue a sexually and emotionally abusive and harassing relationship with Ms. Forth.

150.   LCSD #1, through JJH Principals, created and/or increased Ms. Forth's vulnerability to danger through: (a) its adoption and perpetuation of a practice and policy allowing Meza unrestricted and unsupervised access to groom and perpetuate a sexually, harassing and emotionally abusive relationship with a student (Ms. Forth); (b) by its failure to follow its own policies regarding relationships between students and teachers; (c) by its failure to investigate complaints/concerns regarding the inappropriate relationship, including observations made by, at a minimum, Cunningham, Balow and Hunter; and (d) by its failure to notify Ms. Forth's parents about the relationship.

151.   LCSD #1, through Lahiff, further increased Ms. Forth's vulnerability to danger by failing to engage in even minimal inquiry into Meza's proposed adoption of Ms. Forth and Ms. Forth moving into Meza's home seven months before being adopted by Meza.

152.   At all relevant times, Ms. Forth was a minor female student at LCSD #1.

153.   LCSD #1's conduct, through JJH Principals and Lahiff, placed Ms. Forth in substantial serious, immediate, and proximate harm by allowing Meza to groom her and continue a relationship under the guise of tutoring, mentoring, and acting as coach and club advisor. LCSD #1 adopted and perpetuated a practice and policy of allowing Meza unrestricted and unsupervised access to groom and perpetuate a sexually, harassing and emotionally abusive relationship with a student (Ms. Forth) by failing to follow its own policies regarding relationships between students and teachers, by its failure to investigate complaints and/or concerns regarding the inappropriate relationship, including observations made by, at a minimum, Cunningham, Balow and Hunter, and by its failure to notify Ms. Forth's parents about the relationship. Such conduct caused Ms. Forth to be subjected to multiple sexual assaults and mental and emotional distress.

154.   Meza's sexual harassment, sexual assaults and mental and emotional abuse were acts of private violence and not undertaken in his capacity as a state actor.

155.   The known inappropriate relationship between Meza and Ms. Forth made the risk of sexual assault and mental and emotional distress obvious.

156.   LCSD #1, JJH Principals and Lahiff acted recklessly and in conscious disregard of the risk by their acts and omissions as outlined above.

157.   LCSD #1, JJH Principals and Lahiff's actions outlined above shock the conscience.

158.   As a direct and proximate result of their actions, inactions, and deliberate indifference, Ms. Forth sustained, and continues to sustain, injuries for which she is entitled to be compensated, including without limitation:

     a.   Past, present, and future physical and psychological pain, suffering, emotional distress, mental anguish, and loss of enjoyment of life;

151.   LCSD #1, through Lahiff, further increased Ms. Forth's vulnerability to danger by failing to engage in even minimal inquiry into Meza's proposed adoption of Ms. Forth and Ms. Forth moving into Meza's home seven months before being adopted by Meza.

152.   At all relevant times, Ms. Forth was a minor female student at LCSD #1.

153.   LCSD #1's conduct, through JJH Principals and Lahiff, placed Ms. Forth in substantial serious, immediate, and proximate harm by allowing Meza to groom her and continue a relationship under the guise of tutoring, mentoring, and acting as coach and club advisor. LCSD #1 adopted and perpetuated a practice and policy of allowing Meza unrestricted and unsupervised access to groom and perpetuate a sexually, harassing and emotionally abusive relationship with a student (Ms. Forth) by failing to follow its own policies regarding relationships between students and teachers, by its failure to investigate complaints and/or concerns regarding the inappropriate relationship, including observations made by, at a minimum, Cunningham, Balow and Hunter, and by its failure to notify Ms. Forth's parents about the relationship. Such conduct caused Ms. Forth to be subjected to multiple sexual assaults and mental and emotional distress.

154.   Meza's sexual harassment, sexual assaults and mental and emotional abuse were acts of private violence and not undertaken in his capacity as a state actor.

155.   The known inappropriate relationship between Meza and Ms. Forth made the risk of sexual assault and mental and emotional distress obvious.

156.   LCSD #1, JJH Principals and Lahiff acted recklessly and in conscious disregard of the risk by their acts and omissions as outlined above.

157.   LCSD #1, JJH Principals and Lahiff's actions outlined above shock the conscience.

158.   As a direct and proximate result of their actions, inactions, and deliberate indifference, Ms. Forth sustained, and continues to sustain, injuries for which she is entitled to be compensated, including without limitation:

    a.   Past, present, and future physical and psychological pain, suffering, emotional distress, mental anguish, and loss of enjoyment of life;

    b.   Medical bills, counseling, and other costs and expenses for past and future medical and psychological care;

    c.   Impaired educational capacity;

    d.   Future lost wages;

    e.   Attorney fees and costs;

    f.   Punitive damages as necessary and sufficient to deter LCSD #1 from engaging in the same or similar behavior in the future; and

    g.   Such other and further relief that this Court deems just and proper.

## JURY DEMAND

Plaintiff demands a trial to a jury of eight.

## PRAYER FOR RELIEF

WHEREFORE Plaintiff prays for judgment against Defendant for compensatory and punitive damages as set forth above, for her attorney fees and costs of action and for such other and further relief as deemed appropriate after a trial to a jury on all claims triable to a jury.

Dated this 31st day of March 2020.

Weston W. Reeves, 4-1120
Anna Reeves Olson, 6-3692
PARK STREET LAW OFFICE
242 S. Park Street
Casper, Wyoming 82601
(307) 265-3843
(307) 235-0243 *facsimile*
wwr@parkstreetlaw.com
aro@parkstreetlaw.com

*Attorneys for Plaintiff*

# Exhibit A



# Professional Conduct Guide

*The mission of the Professional Teaching Standards Board (PTSB) is to ensure that every student is served by competent, ethical educators who meet rigorous performance standards.*

## The Best Way to Teach is by Example - *Einstein*

The following examples of appropriate professional conduct are presented by the Professional Teaching Standards Board in support of Wyoming educators' commitment to ensuring safe, healthy environments for students. The Professional Teaching Standards Board strongly recommends that all school staff become knowledgeable of their local district's policies regarding professional conduct. **Support a school culture of professionalism** by helping to create a culture of intolerance for unprofessional behavior. Ignoring unprofessional conduct sends the message that such behavior is acceptable.

<u>**HEALTHY BOUNDARIES:**</u> All students have the right to be safe emotionally, physically, and intellectually. More than ever, kids need healthy, clearly-defined relationships with adults. Educators are mentors; and as such, have the responsibility to model, teach, encourage, and support positive, healthy human relationships.

- **Maintain a professional relationship with students inside and outside of school property.**
  - o  Going to parties or socializing with students is inappropriate.
  - o  Assigning or requesting students to do errands to meet personal needs is inappropriate.
  - o  Inviting students to your home, especially when no one else is present, is inappropriate.
  - o  A pattern of writing passes, making excuses, or rides home, for a particular student, or students is inappropriate.
- **Use caution in the way you touch students.**
  - o  Lingering massages or touches, kisses, or **asking for a hug** are inappropriate.
  - o  **Do not engage in, solicit, or consummate any inappropriate written, verbal, or physical relationship with a student.**
- If you need to speak with a student privately, leave your classroom door open.
- Maintain a professional relationship with students at **extracurricular activities.** Loose, inappropriate boundaries set the stage for inappropriate gender and harassment issues.
- Ensure that a **chaperone** is present and available to students during off-campus school sponsored activities. It is recommended that there is a male chaperone for male students and a female chaperone for female students.
- Remind students of the **limits of your relationship as an educator**.
  - o  Affirm the helping nature of your relationship with students.
  - o  Assist students to obtain the additional supports they may need; counseling, medical interventions, etc.
  - o  **As an educator you are a role model, not their friend, not their confidante, or surrogate parent.**
- **Model appropriate language** for students. The use of profanity, vulgarity, put downs, sarcasm, or name calling is inappropriate at all times in the presence of students.
  - o  Student-educator communications should be open and **void of any "hidden messages"**.
- **Dress professionally** – regardless of current trends. Dress in a manner in which you can be actively involved in student learning and activities.
  - o  Clothing with vulgar statements, sexual innuendos, discriminatory put downs, or that promote the use of illegal and unauthorized drugs or alcohol should not be worn at school.
- Students need to be **supervised** at all times while in your classroom.
- Do not use, possess, be under the influence of, or encourage the use of **alcohol, illegal drugs, or the unauthorized use of drugs** while on school property or at a school sponsored activity involving students.
  - o  Do not encourage the use of or supply any illegal or unauthorized drug to students.

<u>**TECHNOLOGY**</u>

- **Do not use your personal phone to text or call students**. If required to use – or recommended to use – by your school, request that the school issue you a phone specifically to use with students.
- **Email students via your school sponsored** web site, computer, or **email.** Do not use your personal email account.  Consider all **emails public.**
- **School computers** are to be used for school purposes at all times –whether used at school or away from school.
  - o  Do not download sexually explicit or any inappropriate or questionable material on school computers.

- **My Space, Facebook**: *If you don't want the Superintendent reading it aloud to you in a meeting, don't post it.*
    - Be aware, once you post something it is there forever. You may take it off – but information you want deleted may already be out on the internet – without any future control by you.
    - Set up your site as private. (Understand that **"privacy" on the internet is an oxymoron**.)
    - When adding photos select the option **"do not share photos".**
    - **Delete any off-color comments** made by friends.
    - **Do not "tag" your photos** with your name or the names of others. Tagging photos means listing the people in the photos by name, either partial or full. "Tagged" photos automatically link to others' sites.
    - Keep blogging work friendly. **Do not use names of co-workers, bosses, or students** in a rant about a bad day at school.
    - Do not allow students into your site.
    - Do not give out personal information.
- **Movies, TV programs**, internet sites, reading material, etc. used at school by you for students need to comply with school district policy.

<u>PROFESSIONAL EDUCATOR</u>
- **Maintain confidentiality.**
    - Grades, test scores, reports from related services personnel (school psychologist's reports, nurse, etc) and information from community agencies (Department of Family Services, police department, etc), and sensitive information shared by family members to you are confidential.
    - **Disclosure of information to persons who do not have** *both a right and a need to know* **is a violation of the law.**
- **Respect differences**; plan for inclusive groupings for instruction and other school activities.
    - Assign leadership roles equitably.
    - Be careful not to group on the basis of race, gender, family, social, or cultural background, national origin, political or religious beliefs, or disability.
    - Actively participate in and comply with Individual Educational Programs (IEP) and 504 plans.
    - Students should not be labeled based on race, gender, sexual orientation, family, social, or cultural background, national origin, political or religious beliefs, or disability. Do not undermine a student's beliefs by criticizing, making fun of, or "subtle" sarcasm.
- Adhere to **federal and state laws**, professional licensure requirements, and local school policies.
- **Recommend for employment** only those educational professionals who have demonstrated professional and ethical behavior.
- Act with honesty and integrity in administering **standardized tests**.
    - Follow the directions for administering the test explicitly.
    - Do not read sections that students are required to read independently.
    - Do not lead a student to the correct answer.
    - Do not falsify answers or copy and teach to specific test items on the test.
    - Do not edit or change any student answers or results.
- Conduct **financial business** with integrity and by honestly accounting for all funds committed to the educator's charge and collect and report funds consistent with the school and district policy.
- Comply with inquiries regarding **investigations and hearings** initiated by the Professional Teaching Standards Board.
- Provide **truthful information** on all documents and applications for licensure.

## *Wyoming Professional Teaching Standards Board*

Additional References:
*Wyoming Rules and Regulations Governing Licensure of School Personnel*, <u>Due Process</u>, Ch 9.
(http://ptsb.state.wy.us/RulesRegulations/tabid/62/Default.aspx )

*Code of Ethics of the Education Profession*:
http://sites.nea.org/aboutnea/code.html

1920 Thomes Ave, Suite 400
Cheyenne, WY  82002
Phone: (307) 777-6261
Fax: (307) 777-8718
Website:  *http://ptsb.state.wy.us*



Created January 2010