# EXHIBIT 11

MAZZONE DEPOSITION


FILED AS CONFIDENTIAL



**Exhibit 12**

**DETECTIVE'S INVESTIGATION:**

On May 26, 2017, Officer J. Horne investigated a sexual assault which occurred at 1216 Alyssa Way. He spoke with the victim ,Gracie Meza. Gracie advised over the past three years she's been having sexual intercourse with Joseph Meza, who is her adopted father.

I was notified By Sergeant Hickerson to respond to the police department and assist Officer Horne with the investigation. When I arrived, Officer Horne advised the following:

In the fall of 2013, Gracie attended Johnson Junior High School as a 7th grader. Joseph Meza was Gracie's 7th grade math teacher. Gracie became close with Joseph because he was aware of an incident where Gracie was a victim of a sexual assault (13-59988). Between October 2013 and May 2014 Gracie would text with Joseph all hours of the day. Gracie advised the text messages were flirty in nature. Around May 2014 the relationship between Gracie and Joseph turned into a sexual relationship. Gracie advised she had consensual sex with Joseph multiple times between May 2014 and October 2015. In October 2015 Joseph started the process to adopt Gracie. Gracie moved into Joseph's home on October 31, 2015 and was adopted in May 2016. Gracie continued having sexual relations with Joseph. Gracie stated the last time she had sexual intercourse with Joseph was around the second week of April 2017.

After speaking with Officer Horne I interviewed Gracie Meza at the Police department.

**INTERVIEW OF GRACIE MEZA:**

On May 26, 2017, I interviewed Gracie at the Cheyenne Police Department. During the interview, she substantially related the following: Over the past three years she has had sexual intercourse with Joseph Meza, who is her adopted father. Gracie first met Joseph when she attended Johnson Junior High School as a 7th grader. Joseph was Gracie's 7th grade math teacher and junior high track coach and school adviser to the running club. She befriended Joseph during her 7th grade year when she was having trouble dealing with being a prior sexual assault victim. She had confided in him about the incident. Their friendship became closer when they started texting and instant message each other at all hours of the day. Gracie described the text messages as "flirty in nature". Their dating relationship started in May 2014 which include sexual intrusion where Joseph digitally penetrated her vagina. The sexual relations with Joseph started in July 2014 which included Joseph inserting his penis into Gracie's



vagina. This continued daily throughout the 2014-2015 school year. At the end of the school day, Gracie would walk out into the neighborhoods near Johnson Junior High School and wait for Joseph. Joseph would drive to the location and pick up Gracie. He would drive Gracie to his home at 1216 Alyssa Way where they would have sexual intercourse, and then he would drive Gracie home. This routine happened Monday through Friday throughout the 2014-2015 school year. Gracie said they would use excuses as running or bicycle riding when they were asked where they had been. During the summer of 2015 the sexual relations continued with Joseph as he was helping with Gracie's training for track and running. Their sexual relations continued throughout the 2015-2016 school year. In October 2015, Joseph and his wife Rebecca Meza (YOB 1983) were approached and asked by Gracie's biological mother, Mandy Eaton (YOB 1977), about adopting Gracie. They started the adoption process for Gracie and she moved into their home on October 31, 2015. Gracie was officially adopted in May of 2016. Gracie said the sexual intercourse with Joseph continued after she moved into their home. Their last sexual encounter was the second week in April 2017.

Gracie described the sexual intercourse with Joseph as vaginal, anal, and oral which occurred at Joseph's home located at 1216 Alyssa Way, Cheyenne, WY. Gracie said they had "sex" in the master bedroom, guest bedroom/her bedroom, bathroom, basement, her vehicle, and a house which was under construction in his neighborhood. The last time she had "sex" with Joseph was in her bed sometime during the first part of April 2017. Gracie wore lingerie during some of the sexual encounters. Gracie said she has not washed the bedding or the lingerie which was still in her bedroom. I asked Gracie if Joseph had anything on his body she could identify. Gracie said Joseph had a mole on the inside of his left thigh and he was circumcised.

Gracie and Joseph exchanged text and instant messages with each other from the beginning of their relationship. The messaging would happen at all hours of the day for the three years. Gracie described the messages as "flirty in Nature" and they spoke of the sexual relations. Gracie said they would use code words which meant sexual activity. The code words were running, bicycling and boarding. Gracie showed me several of the messages on her cell phone. She advised her screen name was "Grassie2107" and Joseph's screen name was 'shootinstar0606". The messages I read were of a "flirty nature" and not



what I expected from a father/daughter relationship. Gracie also said she had sent naked photographs of herself to Joseph. I seized Gracie's cellphone as evidence.

**INTERVIEW OF JOSEPH MEZA:**

On May 26, 2017, after speaking with Gracie, I spoke with Joseph Meza who arrived at the police department looking for Gracie. Joseph said he and Gracie were out to dinner. They had an argument and she left him at the restaurant. He learned through her new boyfriend's family that she was at the police department. Joseph said Gracie had started lying and becoming defiant towards him in the last couple of months. He believes it's because of her new boyfriend. Joseph just wanted to take Gracie and return home. I asked Joseph if I could look at his cellphone and he agreed. I noticed some of the same test messages of a "flirty nature". I explained to Joseph that I was going to seize the cellphone (Verizon Samsung Cell Phone 4G LTE Model #: SM-G900V IMEI#: 990004835280714) as evidence. I told him Gracie has accused him of having sexual intercourse with her for the past three years. Joseph requested an attorney and stopped the interview.

**INTERVIEW OF REBECCA MEZA:**

On May 26, 2017, I spoke with Rebecca Meza. Rebecca said she has been married to Joseph for twelve years and they live at 1216 Alyssa Way. Rebecca said Joseph was a math teacher and track coach at Johnson Junior High School. She described his relationships with his students as close. He would help them any time he could. Joseph's relationship with Gracie started when she was having trouble in school. He was helping her deal with being a previous sexual assault victim. She had confided in him about the incident. Rebecca started helping Gracie when she learned Gracie didn't have any underwear. Rebecca took Gracie shopping for clothes. Joseph and Rebecca were approached by Gracie's mother, Mandy Eaton, and asked about adopting Gracie. Gracie moved into their home for the guardianship period in October 2015, and they adopted Gracie in May 2016. Rebecca said there have been some issues with their marriage. She has slept on the couch for the past three years and has not had sexual relation with Joseph for the same time. They have attempted counseling to resolve the issues. Rebecca said she had no idea Joseph and Gracie were having sexual relations.



**SCENE:**

On May 27, 2017 at approximately 0100 hours, I met Rebecca and Gracie at their home located at 1216 Alyssa Way. Rebecca gave me permission and signed a search warrant waiver to search Gracie's bedroom. During the search of Gracie's bedroom, I collected the bedding from Gracie's bed, and seven pieces of lingerie from Gracie's bedroom. Gracie said she had purchased some of the lingerie items and Joseph had purchased the black lace lingerie bed jacket.

**GRACE MEZA'S VEHICLE:**

During Gracie's interview, I learned that she had sexual relations with Joseph in her vehicle. Gracie said she had intercourse with him in the back seat and oral intercourse in the front seat. On June 5, 2017, I asked Rebecca if she could bring Gracie's vehicle to the police department to be processed for biological evidence. When she arrived with the vehicle Sergeant Hickerson used an alternative light source and located two locations of possible dried biological fluids inside Gracie's vehicle. These locations were located on the middle of the back seat, and on the left front corner of the front passenger seat. Swabs of the possible biologicals were logged into the Cheyenne Police Evidence and requested to be sent to the Wyoming Stat Crime Lab for testing.

**SEARCH OF ELETRONIC DEVIESES:**

On May 30, 2017, I met with Rebecca and Gracie at the police department. Rebecca said she had located several other cell phones and tablets at their home which Gracie and Joseph used. All the cellphones and tablets used by Gracie and Joseph were on Rebecca father's Verizon plan. She said two cellphones and one tablet were used by Gracie and the other cellphone (Verizon Cell Phone HTC 4G LTE Model #: HTC6435L) and tablet (Amazon Kindle Model #: D01400) was used by Joseph. Rebecca signed search waivers for the three cellphones and one tablet used by Gracie. I applied for three search warrants for the three devises used by Joseph.



The devises to be searched were the following:

- Search Wavier
  - Verizon 4G Model: CE0168CD SN: IHDT56NG1 (Gracie's)
  - Verizon Droid SN: IHDT56PE2 (Gracie's)
  - Samsung Model: SMT230NU SN: RF2FA05DTTV (Gracie's)
  - Samsung SN: G31882Y6FT2 (Gracie's)
- Search Warrant
  - Samsung Cell Phone 4G LTE Model #: SM-G900V IMEI#: 990004835280714 (Joe's)
  - Verizon Cell Phone HTC 4G LTE Model #: HTC6435L (Joe's)
  - Amazon Kindle Model #: D01400 (Joe's)

On June 5, 2017, Rebecca notified me about her father, Vince Garcia. She said her father had received a letter from Verizon informing him the company had reset his password and provided him with a temporary password. Rebecca said he contacted Verizon about the resetting of his password. They informed him there was possibly some fraudulent activity on his account. An unknown person had attempted to reset his password and didn't have the correct security information to complete the reset. Verizon assumed it was someone trying to hack his account and the reset the password creating a temporary password. Rebecca also advised Gracie's passwords to her emails on Google have all been reset and she cannot get access. Rebecca said the only person who knows all of Gracie's email information to rest the password was Joseph.

On June 6, 2017, I spoke with Marc Lahiff with the Laramie County School District #1. Marc provided me with Joseph's work laptop computer. Marc also signed a waiver of search warrant for the computer. I returned to the police department and provided the computer and waiver to Detective Girany.

On June 12, 2017, Judge Healy signed three search warrants for two cell phones and one Amazon Kindle which Joseph Meza used. I served the warrants on June 12, 2017.

Detective Girany forensically imaged Grace's tablet and located messages from "shootingstar0606" to "Grassie2107" The message on the tablet mentions the sexual relations Joseph was having with Gracie. The message from Joseph to Gracie on August 12, 2015 at 1740 hours, states "Our Sex is so fn



amazing". On June 12. 2017, I reviewed the 7300 test messages Detective Girany recovered from Gracie's Table. These messages were from May 2014 to November 2014. The messages were of a sexual relation between Joseph Meza and Gracie. Meza was Gracie's math teacher and running coach. Gracie tells Joseph how she likes the sex she has with him. She asked Joseph if he is going to marry her and Joseph replies "yes". The last two messages Joseph sends to Gracie on each day contains one word each "pill" and "Erase." Gracie advised this was Joseph telling her to take the "pill" and "erase" the messages that had sent to each other.

On June 29, 2017, Detective Girany located, on Joseph's Verizon cell phone, HTC 4G LTE Model #: HTC6435L, several photographs which contained a male's penis and several photographs which contained a young female's breasts. The photographs of the female were taken in a bedroom. The bed had the same type of bedding I had recovered from Gracie's bedroom on May 27, 2017. On June 30, 2017, Gracie identified these photographs as being her and Joseph.

The other information located on Joseph's Verizon cell phone, HTC 4G LTE Model were 47,144 messages from 3/30/13 to 3/30/15. During this period Joseph and Grace had 18,926 messages. During the same time frame Joseph and Rebecca had 5,207 messages.

Gracie's Samsung 7 had 4172 texts messages between 5/21/17 to 5/26/17 with 1001 messages between her and joseph. These messages were not the typical messages one would expect from a father daughter relationship. These messages appeared to be from two people who were in a dating relationship. The messages for the last couple days Gracie and Joseph appeared to be arguing about their relationship and Gracie seeing her new boyfriend, Robert.

See Detective Girany's report and the information recovered from the cellphones and tablets.

**GRACIE MEZA'S FORENSIC INTERVIEW:**

On June 8, 2017, a forensic interview on Gracie was conducted at Safe Harbor. Lynn Hyler interviewed Gracie. Gracie substantially related the following: Gracie met Joseph Meza the beginning of


her seventh-grade year at Johnson Junior High School's "Meet the teacher's night". Gracie liked Joseph because he was funny and made learning math fun. Their friendship began in December 2013, when Joseph learned from Gracie's friends that she was a victim of a sexual assault. Joseph spoke with Gracie's mother about assisting Gracie with her schoolwork and received her permission to call Gracie after school hours. Their relationship developed into a friendship spending time together after school and on weekends. In May 2014 Joseph asked Gracie if she would be interested in taking their friendship to the next level and start dating. Gracie liked this idea and told Joseph she would like to date him. Gracie described their relationship as boyfriend/girlfriend which included hugging and kissing. Their sexual relationship started over the next couple of months. In July 2014, Gracie had sex with Joseph for the first time. Joseph took Gracie to his house while his wife was at work. He would make Gracie lay on the floor of his vehicle while he checked the house for his wife. He would take Gracie into the guest bedroom and they would have sexual intercourse. Gracie said this would happened several times a week for the 2014 summer break and then continued into the 2014-2015 school year.

In 2015 Gracie's mother approached Joseph and Rebecca Meza and asked them to adopt Gracie. They started the adoption process and Gracie moved into their house on October 31, 2015. Gracie said her sexual relationship with Joseph continued after she moved into their home. They made the guest bedroom into her bedroom. Gracie said on a daily bases Joseph would wait until Rebecca was asleep and then he would sneak into her bedroom and have sex with her in her bed. The adoption was finalized in May 2016. Gracie said the sexual relation continued until April 2017. Gracie said their last sexual encounter was the first part of April 2017. Gracie wanted to stop the relationship because she had a new boyfriend in high school. Gracie and Joseph had a fight at the restaurant the night she reported it to the police.

During this interview Gracie stated she had traveled out of state with Joseph several times for vacation and races he attended. They traveled to Florida, Minneapolis, Minnesota, and Las Vegas, Nevada. Gracie said they had sexual intercourse at those locations. Gracie said on two separate occasions they traveled to Las Vegas, Nevada for half marathon races. They had sex each time they went to Las Vegas. The last time was in November 2016. Gracie said she had a Urinary Tract Infection while on



this last trip. When they returned Joseph took her to Americans Express Urgent Care for treatment and a pregnancy test.

**DETECTIVE'S ACTION:**

On June 29, 2017, I went to College Drive Urgent Care and Americas Express Urgent Care to obtain information on Gracie being seen at these location for treatment of an Urinary Tract Infection treatment and a pregnancy test.

- College Drive Urgent Care advised they had just gone to a new system of record keeping and was unable to find any record of treating Gracie.
- Americas Express Urgent Care located records for two visits by Gracie. The first visit on January 5, 2016 was for vomiting. The second visit was on November 25, 2016. This visit was for Dysuria. She reported to the nurse that she has had the same sexual partner for three years and they always used a condom. She requested a pregnancy test. The results was a Urinary Tract Infection.

On July 6, 2017, I received a tip that an associate principle at Johnson Junior Highs school had counseled Joseph Meza about boundaries with students. I spoke with Tina Hunter (307-256-9017). Hunter said a couple of years ago she had noticed that Gracie was spending a lot of time in Joseph's classroom. She even caught Gracie in his classroom during a time she was supposed to be in another classroom. Hunter verbally counseled Joseph about his boundaries with students.

On July 10, 2017, Judge Healy signed a search warrant for Joseph Meza's DNA and photographs of his penis and thigh area. I served the search warrant the same day at the Laramie County Jail. I collect DNA Buccal swabs from Joseph Meza and took photographs of Joseph's penis and thigh area. While taking the photographs I noticed Joseph had a mole on the inside of his right thigh. This mole was similar to the mole in the photographs found on Joseph's cellphone.



On July 9, 2017, I received information from the Wyoming State Crime Lab about the bedding I had recovered from Gracie's bed. Earlier I sent the bedding to the lab to be screened for biological fluids. The lab informed me they had located semen on the bedding. They compared the DNA in the semen to the DNA buccal swabs I collected from Joseph Meza. The DNA from the semen was a mixture of Joseph and Gracie's DNA. This was preliminary results and a report from the lab will follow.

**ATTACHEMENTS:**

1. Original Report
2. Gracie's Meza's written statement
3. Waiver of Search Warrant for 1216 Alyssa Way
4. Four Waivers of Search Warrant signed by Rebecca Meza
5. Affidavit, Search Warrant, and Return for Joseph Meza's cellphone and tablet
6. Letter to Judge Healy
7. Copy of Verizon Letter to Rebecca's father
8. Affidavit, Search Warrant, and Return for Joseph Meza's DNA and Photos
9. Waiver of Search Warrant sighed by Marc Lahiff for Joseph work computer from LCSD#1
10. Medical Records Waiver for College Drive Urgent Care
11. Medical Records Waiver for Americans Express Urgent Care
12. Medical records from Americans Express Urgent Care
13. Copies of Photograph taken from Joseph Meza's Facebook page.
14. CD of Gracie's interview
15. CD of Gracie's forensic interview
16. CD with photographs of the scene at 1216 Alyssa Way
17. CD with photographs of Gracie's vehicle
18. CD with Photographs of Joseph Meza

**DISPOSITION:**

Refer this case to the District Attorney's Office for charges on Joseph Meza.

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF WYOMING

---

GRACIE ANN FORTH,

Plaintiff,

vs. Case No. 1:20-CV-00053-ABJ

LARAMIE COUNTY SCHOOL DISTRICT NO. 1 and John/Jane Does 1-10 in his/her official capacity,

Defendants.

---

VIDEOCONFERENCE DEPOSITION OF REBECCA ROBINSON
Taken in behalf of Plaintiff

1:00 p.m., Wednesday
January 27, 2021

PURSUANT TO NOTICE, the videoconference deposition of REBECCA ROBINSON was taken in accordance with the applicable Federal Rules of Civil Procedure before Randy A. Hatlestad, a Registered Merit Reporter and a Notary Public in and for the State of Wyoming.

they came in and just kind of wanted to chitchat with me.
Q. Uh-huh. Okay.
A. And they had shared that they just didn't like Mr. Meza initially.
Q. Do you remember when this was?
A. It was like the very last day of the school year, the 2014-2015 school year.
Q. So this would have been in the spring of 2015?
A. Yeah, like the last day of school, from what I recall.
Q. How many students came in to talk to you about him?
A. I don't remember the exact amount.
Q. You don't need to remember an exact amount. Was it more than five?
A. No. It was maybe three or four girls.
Q. Any boys in this group?
A. No.
Q. Just girls?
A. Uh-huh.
Q. Do you remember what -- what did they say? Why did they not like him?
A. They said that they didn't like him because they expressed how they thought he was weird. And they used the example that he -- they had seen him share a

drink with a student. They shared it was Gracie with me. That was kind of the conversation.
Q. So, when they said they thought he was weird and they present this to you, do you remember what your response was?
A. I remember just, one, kind of being conflicted because they weren't supposed to be in my room.
Q. Right.
A. They weren't supposed to be there. So I wasn't trying to have this long, engaged conversation where they're missing their class. So I remember just feeling like, "Okay, girls, what's going on?" type of thing. And then when they said that, I was just, "Oh, you know, why do you say that?" type of thing. I didn't want to say, "Oh" -- you know, shut them down when they needed to share something with me.
Q. Sure.
A. And so, after they shared that, I remember I didn't really get into it with them. I didn't explore that any more with them. I just kind of absorbed what they were saying what they thought was a concern. And then I said okay. You know, I kind of pushed them along their way, helped them get back to their class, and that was kind of the end of the conversation.
Q. How long did this conversation last?

A. Minutes. It wasn't very long at all.
Q. Did they say what they thought was weird about him?
A. No. They didn't elaborate. It was just like the feeling they said that they felt. They didn't go into much detail.
Q. So they come in and they say -- I just want to make sure I got this right. The last day of school, 2015, "We don't really like Mr. Meza. He's weird. And we saw him sharing a soda or a drink with Gracie"?
A. Yeah. And I think that was because I was like, "Oh, why would you say that?" like trying to --
Q. Understand.
A. Yeah. "Why are you feeling that way?" you know, trying to act like I was concerned for their point of view. And that's when they -- kind of the reason they gave.
Q. So then after you received this information, what did you do?
A. So that was the last hour of the day, which was my off-hour. So I remember kind of being like, you know, I feel like I needed to report this. These girls came to me. Obviously, they wanted me to know this. I feel like it was right that I let someone else know, and they could do with it what they felt necessary. So I went into the

office and found Tina Hunter and shared the information with her.
Q. On that same day?
A. Yes.
Q. And was anyone else present in this meeting besides you and Tina Hunter?
A. No.
Q. And what did you tell Ms. Hunter?
A. I basically just told her that these girls had come in my room. I was trying to get them to keep going, but they wanted to share this information. I said they were upset because they said they had seen Joe share a drink with Gracie and just kind of told her exactly what had happened, what they shared.
Q. And what was Ms. Hunter's response?
A. She was writing down what I shared with her in the notebook. She and I didn't really have a conversation about it. We didn't really go into discussion about the ins and outs of what they had said. I just remember her writing it down and then kind of thanking me, and that was it.
Q. Did she say anything like, "I've had to counsel him about boundaries before"?
A. No.
Q. She didn't make any comments about Mr. Meza?

A. No.
Q. Just kind of wrote this down, and then that was the end of it?
A. Right.
Q. Thank you. Any other concerns ever about Mr. Meza?
A. No.
Q. This is the only one?
A. Yeah.
Q. Did you share this story of them drinking out of the same drink with any other teachers or staff?
A. I did.
Q. Who else did you talk to?
A. I shared it with Shannon Hall.
Q. And what did she -- was it around the same time that you reported to Tina Hunter?
A. Yes.
Q. And what did Ms. Hall say?
A. You know, she just said I had done the right thing by reporting it and thought that that was something that I should have done.
Q. Did she mention that she'd also made several reports about Mr. Meza?
A. I don't remember that.
Q. Do you know of any other teachers who went

to -- who were concerned about Mr. Meza?
A. No.
Q. Thank you. Do you recall any other teachers expressing concern to you about Mr. Meza?
A. No.
Q. All right. Thank you. What was Mr. Meza like as a teacher?
A. I don't know.
MR. COPPEDE: Objection. Foundation.
Q. (BY MS. OLSON) I'm sorry. Go ahead.
A. Me?
Q. Yes.
A. I don't know. I never saw him teach.
Q. Did you ever suspect that he had boundary issues with students?
A. No. I wasn't around him enough.
Q. Aside from maybe this one concern that you had?
A. Right. Yeah. Besides that, I just -- I wasn't around him, so I didn't -- I wouldn't know.
Q. So you never observed him teaching?
A. No.
Q. Where was your classroom in relation to Mr. Meza's?
A. I taught on the first floor, and he taught on the second floor. I basically taught underneath his

room. So we just didn't come in contact with each other really ever.
Q. And while Mr. Meza was there, you were teaching seventh grade U.S. history?
A. I was teaching eighth grade.
Q. Eighth grade?
A. And he taught seventh grade.
Q. So you wouldn't have the need to walk by his classroom to get anything?
A. No. We didn't share students or anything like that.
Q. Did you ever coach track or help with track?
A. No.
Q. Cross-country?
A. No.
Q. Were you participating in any school clubs?
A. No.
Q. Did you know about the running club?
A. No.
Q. You never heard about that?
A. No.
Q. Okay.
A. I guess maybe I knew there was one.
Q. I was just curious. I think I know the answer to this, but while you were teaching with Mr. Meza at the

same time, did you ever socialize with him?
A. No.
Q. Do you know who he socialized with?
A. I knew he was -- I knew who his friends were. And we were not in the same friend group at all.
Q. I believe one of his friends was Melinda Mazzone. Is that correct?
A. Yes.
Q. Who were his other friends in his social group?
A. I feel like, to my knowledge, she was his only -- I only knew of their close friendship.
Q. You're not aware of any other close friendships he had?
A. No.
Q. Did you ever see him really at all outside of school?
A. No.
Q. When did you first meet Gracie Forth, if you recall?
A. I never met her.
Q. Oh, she was never a student of yours?
A. No.
Q. Okay. Do you know who she is?
A. No. I only know the name. I don't know who she is. I don't even know what she looks like.

**Exhibit 14**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF WYOMING

---

GRACIE ANN FORTH,

Plaintiff,

vs. Case No. 1:20-CV-00053-ABJ

LARAMIE COUNTY SCHOOL DISTRICT NO. 1 and John/Jane Does 1-10 in his/her official capacity,

Defendants.

---

VIDEOCONFERENCE DEPOSITION OF ERIN J. McNAMEE
Taken in behalf of Plaintiff

9:00 a.m., Wednesday
January 27, 2021

PURSUANT TO NOTICE, the videoconference deposition of ERIN J. McNAMEE was taken in accordance with the applicable Federal Rules of Civil Procedure before Randy A. Hatlestad, a Registered Merit Reporter and a Notary Public in and for the State of Wyoming.

Q. Shannon Hall reported an incident where Mr. Meza and Gracie were sharing a soda. Do you recall anything like that?
A. No.
Q. Is that something you think you would remember?
A. Yes.
Q. And why is that? Is that inappropriate?
A. Yeah.
Q. There have also been reports that Mr. Meza and Gracie were absent on the same school days together. Do you recall that?
A. No.
Q. Never noticed that?
A. No.
Q. In the fall of 2014, Mr. Meza, Ella Parish and Gracie went to Denver together to run a half marathon. Were you aware of that?
A. Yes.
Q. And when were you made aware of that?
A. I don't remember when I was made aware of that. It was before they left.
Q. Tell me about that. How did you find out about it?
A. I don't know. I don't remember how I found out about it.

Q. Do you think it was from Mr. Meza or --
A. Since Gracie was my student at that time, I would imagine she probably -- I was probably informed since she was going to his class.
Q. Okay. And do you know who was going on this trip?
A. Did I know who was going on the trip?
Q. Yeah.
A. No. Well, I guess I knew that it was for running club. And I was -- and I knew that Mr. Meza was the coach of running club and that Gracie was in running club. And I knew that Ms. Parish was going because there was no other students, and they needed a chaperone.
Q. And did you know that Mr. Meza --
A. [Unintelligible.]
Q. Sorry?
A. A female chaperone, you know, for Gracie.
Q. Did that raise any concerns with you?
A. Huh-uh.
Q. No?
A. No. I just -- I thought they were going to a race.
Q. Is it appropriate for a teacher to drive a student?
A. If he had -- if it was for a club and he had

passed the district driving pass. I mean, coaches drive students, I think. I had a driving pass to drive kids to a poetry slam one year. You have to take a test through the district.
Q. Do you know if Mr. Meza had a driving pass?
A. I don't know.
Q. Did you just assume that he did?
A. Yes.
Q. How do you get a driving pass?
A. There's a class you take at the district.
Q. Can you drive your own car?
A. No.
Q. You have to drive a school car?
A. Yes.
Q. So did you know that Mr. Meza drove his own car?
A. No.
Q. And that it was not a school-sponsored trip?
A. I did not know that.
Q. Would that change your impression about it, about whether the trip was appropriate?
A. Yes.
Q. Why is that?
A. I mean, I would feel that -- I mean, I think you would need to have a school-sponsored trip to take a

student somewhere.
Q. Are you friends with Ella Parish?
A. Acquaintances, I would say.
Q. Did you ever socialize with her?
A. Not really.
Q. Did you know they took another trip to Denver in December of 2014? Did you know about that second trip?
A. Well, I thought there was just one trip, so I don't know which one I knew about.
Q. You didn't know about both of them?
A. No.
Q. Did you ever think about talking to administration about taking Gracie to Denver?
A. No. I thought it was a school function.
Q. And you didn't ask Gracie any questions to find out whether it was, indeed, a school function?
A. No.
Q. After Gracie graduated from Johnson Junior High, did you ever see her back in the school when she was at South?
A. Yes.
Q. Tell me about that. How frequently would you see her at Johnson Junior High after she graduated from Johnson?

# EXHIBIT 15

FILED AS CONFIDENTIAL

# EXHIBIT 16

LaHIFF DEPOSITION

FILED AS CONFIDENTIAL

# EXHIBIT 17

Adoption Decree

FILED AS CONFIDENTIAL

**EXHIBIT 18**

635-6731 John Peterson from the Cheyenne Police Department returned my call on 6/6/17. He reported that Joe Mesa is under investigation for the sexual abuse of a minor. At this point in time it is the adoptive daughters word against his however they are in the process of getting a search warrant to be able to check his cell phone. The police say it was reported that the first contact was made during the summer between seventh and eighth grade. When confronted with the accusation he responded oh boy oh boy I better get an attorney. I advised Officer Peterson that we were in possession of Mr. Mezas work computer and asked if he would like us to do a forensics search or if they were going to request it. He said he would do some checking and get back to me. The detective called back and said he was going to come and get the computer from me today.

July 6, 2017 Det. John Peterson called and advised that he now has enough to move forward with a request for an arrest warrant. He also asked if he could have help accessing the District computer that Mr. Meza had as a teacher. I notified Dennis Pacheco and asked him to make a contact to the Detective. I had a call from Tina Hunter who evaluated Mr. Meza. She had been contacted by the detective to see if she ever had any suspicions regarding inappropriate behavior with students. She is going to write up a statement and forward it to me to have David Evans review.

July 10 – I received the information from Tina Hunter regarding an interaction that occurred between Tina and Joe Meza. She reported to me that Mr. Meza would have students in his room during the school day what were actually assigned to other classes. During the time they were in there Mr. Meza was teaching a class.

July 17 – I forwarded the statement from Tina Hunter and am waiting for the review by David Evans. I picked up the affidavit for probable cause and provided a copy to John Lyttle and sent one to David Evans. David Evans said [redacted]

July 18 – I had a conversation with Mr. Balow, previous principal at Johnson regarding his interactions with Mr. Meza. He reported Mr. Meza came highly recommended and was even notified by the superintendent Mark Stock, that he would be a good candidate to take a look at. Mr. Balow reported Mr. Meza had worked to build the cross country team through the creation of a running club and that he built good relationships with kids and was fairly popular. He did recall having a discussion at one point with Mr. Meza regarding kids being in his room frequently. Mr. Balow said there would be both boys and girls in his room afterschool, some for math help, others socializing. Mr. Balow discussed with him to be careful because it could be a perception of some that the students being in there was not appropriate. He did say that Mr. Meza appreciated the concerns expressed and did some things to turn it around. Mr. Balow thought it was documented in a file at the school. He then went to Johnson to pick up the site file. I reviewed the site file and the personnel file. Overall the evaluations were very positive regarding all four of the professional domains. The site file did contain a document that was created by John Cunningham, previous assistant principal at Johnson. In the documentation it reported Mr. Meza was at a football game on September 26, 2014. Mr. Cunnigham observed some 7th grade girls sitting with Mr. Meza and one of the girls had her arm on Mr. Meza and was touching his face and neck. Mr. Cunningham then met with Mr. Meza on the next day and told him it was inappropriate and gave him suggestions on how to communicate with students the need for boundaries and personal space. Mr. Meza was amenable to the suggestions and apologized for the occurrence. No other documents were in the site file.

I also spoke with Mr. Cox and he had no concerns with Mr. Meza instructionally or with his professional behavior. He reported the young lady did drop him off at work on occasion and did attend a school get together at Mr. Cox's house with her. However it did not strike him as unusually since it was his adopted daughter and others had also brought their children with them. Mr. Cox reported he never had any concerns about any inappropriate behavior or relationships with students.

July 21
David advised [REDACTED] If we do decide to terminate it will take him some time to get it together. Remind administrators to hang on to any files pertaining to Mr. Meza and do not destroy any of them. If there is anything that may pertain to the accusations have them bring me a copy.

**EXHIBIT 19**

# COVER INFORMATION SHEET

CIRCUIT COURT FOR LARAMIE COUNTY
CHEYENNE, WY

Case No: **CR-2017-0001237**
33-537

STATE OF WYOMING,
Plaintiff,

THE STATE OF WYOMING )
COUNTY OF LARAMIE )ss.

BEFORE: **Denise Nau**

VS.

ATTORNEY FOR STATE: **Jeremiah Sandburg**

**Joseph Kent Meza**

FILED
JUL 14 2017
DIANE SANCHEZ
CLERK OF THE DISTRICT COURT

ATTORNEY FOR DEFENDANT: **Thomas A Fleener**

Retained [ X ] Appointed [ ] Waived [ ]

7/7/2017 Criminal Complaint filed by District Attorney

7/7/2017 Criminal Warrant/Summons issued to Laramie County Sheriff's Department

Summons Appearance Date ______________

Defendant charged with:
**6-2-314 aiii-SEX ABUSE/MINOR 1ST DEG-ACTR=TO> 18/INTRSN VIC<16 & ACTR IN POSITN/AUTHRTY**
**6-2-314 aiii -SEX ABUSE/MINOR 1ST DEG-ACTR=TO> 18/INTRSN VIC<16 & ACTR IN POSITN/AUTHRTY**
**6-2-314 aiii -SEX ABUSE/MINOR 1ST DEG-ACTR=TO> 18/INTRSN VIC<16 & ACTR IN POSITN/AUTHRTY**
**6-2-314 aiii - SEX ABUSE/MINOR 1ST DEG-ACTR=TO> 18/INTRSN VIC<16 & ACTR IN POSITN/AUTHRTY**
**6-2-314 aiii - SEX ABUSE/MINOR 1ST DEG-ACTR=TO> 18/INTRSN VIC<16 & ACTR IN POSITN/AUTHRTY**
**6-2-314 aiii-SEX ABUSE/MINOR 1ST DEG-ACTR=TO> 18/INTRSN VIC<16 & ACTR IN POSITN/AUTHRTY**
**6-2-314 aii - SEX ABUSE/MINOR 1ST DEG-ACTR=TO>18-INTRSN VIC<18; ACTR VIC'S GUARDIAN**
**6-2-314 aii - SEX ABUSE/MINOR 1ST DEG-ACTR=TO>18-INTRSN VIC<18; ACTR VIC'S GUARDIAN**

7/10/2017 Defendant appeared initially in Court; stated that his name was correctly shown; the nature and penalty of the crime was explained; and he was advised of his constitutional rights.

---

Bond for appearance $ 100000.00 [X ]cash [ ]cash/surety [ ] at ____ %

7/18/2017 Date set for preliminary hearing.
Continued to ____________ at ____________

7/13/2017 Preliminary Hearing; Waived [ X ] Bound Over [ ] Discharged [ ]

7/13/2017 Bond reviewed; Continued [ ], reset at $ 100,000 at 10%

7/13/2017 Transmitted to District Court, papers, docket, bail.

CIRCUIT COURT JUDGE

Circuit Court Of The 1st Judicial District * State of Wyoming * Laramie County *



STATE OF WYOMING )
) SS:
COUNTY OF LARAMIE )

THE STATE OF WYOMING

Plaintiff,

vs.

J. K.M,
YEAR OF BIRTH: 1982

Defendant.

IN THE CIRCUIT COURT
FIRST JUDICIAL DISTRICT
Criminal Action No. CR - 2017-1237

33-537

FILED
JUL 14 2017
DIANE SANCHEZ
CLERK OF THE DISTRICT COURT

CIRCUIT COURT FILED
JUL 13 2017

## ** SECOND AMENDED INFORMATION**

**COMES NOW, Jeremiah N.R. Sandburg, District Attorney**, First Judicial District, and in the name and by the authority of the State of Wyoming, informs the Court and gives the Court to understand that:

***<u>Count I: 1st Degree Sexual Abuse of Minor - > 18, Position of Authority</u>***

***1. On or about the period of May 01, 2014 to July 01, 2014;***

***2. In the County of Laramie and the State of Wyoming;***

***3. J.K.M.***

***4. Did being eighteen (18) years of age or older, inflict sexual intrusion on a victim who is less than sixteen (16) years of age, and the actor occupies a position of authority in relation to the victim, to wit J.K.M. being thirty-one (31) years of age, inflict sexual intrusion on G.M. (YOB 2000) who was fourteen years of age, by digital penetration, and that J.K.M. occupied a position of authority in relation to G.M. (YOB 2000), having been her math teacher the previous school year immediately preceding this timeframe and currently was her running club advisor, in violation of W.S.§6-2-314(a)(iii) & (b), 2013 Lexis, the same being a Felony, contrary to the form of the statute in such case made and provided, and against the peace and dignity of the State of Wyoming. (SEE AFFIDAVIT OF PROBABLE CAUSE);***

***Penalties: 0 - 50 years and/or $10,000 Fine***

***<u>Count II: 1st Degree Sexual Abuse of Minor - > 18, Position of Authority</u>***

***1. On or about the period of July 02, 2014 to August 30, 2014;***

***2. In the County of Laramie and the State of Wyoming;***

***3. J.K.M.***

*4. Did being eighteen (18) years of age or older, inflict sexual intrusion on a victim who is less than sixteen (16) years of age, and the actor occupies a position of authority in relation to the victim, to wit: J.K.M. being thirty-one (31) years of age, inflict sexual intrusion on G.M. (YOB 2000) who was fourteen years of age, by vaginal intercourse, and that J.K.M. occupied a position of authority in relation to G.M. (YOB 2000), having been her math teacher the previous school year, and currently was her running club advisor, in violation of W.S.§6-2-314(a)(iii) & (b), 2013 Lexis, the same being a Felony, contrary to the form of the statute in such case made and provided, and against the peace and dignity of the State of Wyoming. (SEE AFFIDAVIT OF PROBABLE CAUSE);*

*Penalties: 0 - 50 years and/or $10,000 Fine*

*<u>Count III: 1st Degree Sexual Abuse of Minor - > 18, Position of Authority</u>*

*1. On or about the period of August 31, 2014 to February 11, 2015;*

*2. In the County of Laramie and the State of Wyoming;*

*3. J.K.M.*

*4. Did being eighteen (18) years of age or older, inflict sexual intrusion on a victim who is less than sixteen (16) years of age, and the actor occupies a position of authority in relation to the victim, to wit: J.K.M. being between thirty-one (31) and thirty-two (32) years of age, inflict sexual intrusion on G.M. (YOB 2000) who was fourteen years of age, by vaginal intercourse, and that J.K.M. occupied a position of authority in relation to G.M. (YOB 2000), having been her math teacher the previous school year, and was currently her track coach and running club advisor, in violation of W.S.§6-2-314(a)(iii) & (b), 2013 Lexis, the same being a Felony, contrary to the form of the statute in such case made and provided, and against the peace and dignity of the State of Wyoming. (SEE AFFIDAVIT OF PROBABLE CAUSE);*

*Penalties: 0 - 50 years and/or $10,000 Fine*

*<u>Count IV: 1st Degree Sexual Abuse of Minor - > 18, Position of Authority</u>*

*1. On or about the period of February 12, 2015 to June 01, 2015;*

*2. In the County of Laramie and the State of Wyoming;*

*3. J.K.M.*

*4. Did being eighteen (18) years of age or older, inflict sexual intrusion on a victim who is less than sixteen (16) years of age, and the actor occupies a position of authority in relation to the victim, to wit: J.K.M. being thirty-two (32) years of age, inflict sexual intrusion on G.M. (YOB*

*2000) who was fifteen years of age, by vaginal intercourse, and that J.K.M. occupied a position of authority in relation to G.M. (YOB 2000), having been her math teacher the previous school year, and was currently her track coach and running club advisor, in violation of W.S.§6-2-314(a)(iii) & (b), 2013 Lexis, the same being a Felony, contrary to the form of the statute in such case made and provided, and against the peace and dignity of the State of Wyoming. (SEE AFFIDAVIT OF PROBABLE CAUSE);*

*Penalties: 0 - 50 years and/or $10,000 Fine*

*Count V: 1st Degree Sexual Abuse of Minor -> 18, Position of Authority*

*1. On or about the period of June 02, 2015 to August 30, 2015;*

*2. In the County of Laramie and the State of Wyoming;*

*3. J.K.M.*

*4. Did being eighteen (18) years of age or older, inflict sexual intrusion on a victim who is less than sixteen (16) years of age, and the actor occupies a position of authority in relation to the victim, to wit: J.K.M. being thirty-two (32) years of age, inflict sexual intrusion on G.M. (YOB 2000) who was fifteen years of age, by vaginal intercourse, and that J.K.M. occupied a position of authority in relation to G.M. (YOB 2000), and was currently her running club advisor over the summer vacation, in violation of W.S.§6-2-314(a)(iii) & (b), 2013/2015 Lexis, the same being a Felony, contrary to the form of the statute in such case made and provided, and against the peace and dignity of the State of Wyoming. (SEE AFFIDAVIT OF PROBABLE CAUSE);Penalties: 0 - 50 years and/or $10,000 Fine*

*Count VI: 1st Degree Sexual Abuse of Minor -> 18, Position of Authority*

*1. On or about the period of August 31, 2015 to October 30, 2015;*

*2. In the County of Laramie and the State of Wyoming;*

*3. J.K.M.*

*4. Did being eighteen (18) years of age or older, inflict sexual intrusion on a victim who is less than sixteen (16) years of age, and the actor occupies a position of authority in relation to the victim, to wit: J.K.M. being thirty-two (32) years of age, inflict sexual intrusion on G.M. (YOB 2000) who was fifteen years of age, by vaginal intercourse, and that J.K.M. occupied a position of authority in relation to G.M. (YOB 2000), and was currently her track coach and running club advisor, in violation of W.S.§6-2-314(a)(iii) & (b), 2015 Lexis, the same being a Felony, contrary to the form of the statute in such case made and provided, and against the*

*peace and dignity of the State of Wyoming. (SEE AFFIDAVIT OF PROBABLE CAUSE);Penalties: 0 - 50 years and/or $10,000 Fine*

***Count VII: 1st Degree Sexual Abuse of Minor - > 18, Guardian of victim***

*1. On or about the period of October 31, 2015 to May 01, 2016;*

*2. In the County of Laramie and the State of Wyoming;*

*3. J.K.M.*

*4. Did being eighteen (18) years of age or older, inflict sexual intrusion on a victim who is less than eighteen (18) years of age, and the actor is the victim's legal guardian or an individual specified in W.S. §6-4-402, to wit: J.K.M. did being between thirty-two (32) to thirty-three (33) years of age, inflict sexual intrusion on G.M. (YOB 2000) who was between fifteen (15) and sixteen (16) years of age, by vaginal intercourse, and J.K.M. was G.M.'s (YOB 2000) legal guardian, in violation of W.S.§6-2-314(a)(ii) & (b), 2015 Lexis, the same being a Felony, contrary to the form of the statute in such case made and provided, and against the peace and dignity of the State of Wyoming. (SEE AFFIDAVIT OF PROBABLE CAUSE);*

*Penalties: 0 - 50 years and/or $10,000 Fine*

***Count VIII: 1st Degree Sexual Abuse of Minor - > 18, Guardian of victim***

*1. On or about the period of May 02, 2016 to April 01, 2017;*

*2. In the County of Laramie and the State of Wyoming;*

*3. J.K.M.*

*4. Did, being eighteen (18) years of age or older, inflict sexual intrusion on a victim who is less than eighteen (18) years of age, and the actor is the victim's legal guardian or an individual specified in W.S. §6-4-402, to wit: J.K.M. did being between thirty-three (33) to thirty-four (34) years of age, inflict sexual intrusion on G.M. (YOB 2000) who was between sixteen (16) to seventeen (17) years of age, by vaginal intercourse, and J.K.M. was G.M.'s (YOB 2000) adoptive parent, in violation of W.S.§6-2-314(a)(ii) & (b), 2015 Lexis, the same being a Felony, contrary to the form of the statute in such case made and provided, and against the peace and dignity of the State of Wyoming. (SEE AFFIDAVIT OF PROBABLE CAUSE);*

*Penalties: 0 - 50 years and/or $10,000 Fine*

Probable Cause for this Information is based upon the Affidavit of Probable Cause of John C Pederson P61 of the Cheyenne Police Department.

Dated this 13 day of July, 2017.

Jeremiah N.R. Sandburg, #6-4340
District Attorney
310 West 19th Street, Suite 200
Cheyenne, WY 82001
(307) 633-4360

STATE OF WYOMING )
COUNTY OF LARAMIE )ss

I, Jeremiah N.R. Sandburg, District Attorney of the County of Laramie, State of Wyoming, First Judicial District do solemnly swear that I have read the above and foregoing information by me subscribed, that I know the contents thereof, and that I have been reliably informed and verily believe the facts therein stated to be true. So help me God.

JEREMIAH N.R. SANDBURG

Sworn to before me and signed in my presence the 13 day of July, 2017, and I do hereby so certify.

NOTARY PUBLIC

My commission expires 8-7-17

RHONDA J. HOADLEY - NOTARY PUBLIC
COUNTY OF LARAMIE STATE OF WYOMING
MY COMMISSION EXPIRES AUG. 7, 2017

**CERTIFICATE OF SERVICE**

I, Rhonda J. Hoadley, Advanced Certified Paralegal for the District Attorney's Office, do hereby certify that on this 13 day of July, 20 17 a true and correct copy of the above was mailed to:

Thomas Fleener
Fleener Law, P.C.
P.O. Box 1049
Laramie, WY 82073

Advanced Certified Paralegal
Office of the District Attorney

**STATE OF WYOMING** )
) **SS:**
**COUNTY OF LARAMIE** )

**CIRCUIT COURT**
**FIRST JUDICIAL DISTRICT**
**Criminal Action No. 20__-____**

**THE STATE OF WYOMING**
**Plaintiff,**

**vs.**

**Joseph Kent Meza**
**YOB: 1982**
**Defendant.**

**IN THE DISTRICT COURT**

**FIRST JUDICIAL DISTRICT**

## AFFIDAVIT OF PROBABLE CAUSE

**COMES NOW, Detective Pederson, and being first duly sworn on oath, deposes and states as follows:**

1. That I am a duly authorized Peace Officer in the State of Wyoming as defined by W.S. § 7-2-101(a)(iv) and acted at all times described herein in my official capacity as a member of the Cheyenne Police Department.

2. That unless otherwise indicated, all events described herein occurred in Laramie County, Wyoming.

3. On May 26, 2017, Officer J. Horne investigated a sexual assault which occurred at 1216 Alyssa Way. He spoke with the victim GM (YOB:2/12/2000) a seventeen-year-old female. GM advised over the past three years she has been having sexual intercourse with Joseph Meza, (YOB 1982), who was her junior high school math teacher/track coach and is now her adopted father.

4. On May 26, 2017, I was requested to assist Officer J. Horne with the investigation. Officer J. Horne advised he had spoken with GM and she substantially related the following to him: In the fall of 2013, GM attended Johnson Junior High School as a 7th grader. Joseph Meza was GM's 7th grade math teacher. GM was a victim of an unrelated sexual abuse of a minor which was reported on November 29, 2013. GM became close with Joseph because she was confiding in him about the incident. Between December 2013 and May 2014 GM would text and instant message with Joseph all hours of the day. GM advised the text messages were "flirty" in nature. In May 2014, the relationship between GM and Joseph turned into a sexual relationship. GM advised she had sex with Joseph multiple times between May 2014 and October 2015. In October 2015 Joseph started the process to adopt GM. GM moved into Joseph's home on October 31, 2015, and she was adopted in May 2016. After GM moved into Joseph's home, she continued having sexual relations with him. GM stated the last time she had sexual intercourse with Joseph was around the first part of April 2017.

5. On May 26, 2017, I interviewed GM at the Cheyenne Police Department. During the interview, she substantially related the following: Over the past three years she has had sexual intercourse with Joseph Meza, who is her adopted father. GM first met Joseph when she attended Johnson Junior High School as a 7th grader. Joseph was GM's 7th grade math teacher and junior high track coach and school adviser to the running club. She befriended Joseph during her 7th grade year when she was having trouble dealing with being a prior sexual assault victim. She had confided in him about the incident. Their friendship became closer when they started texting and instant message each other at all hours of the day. GM described the text messages as "flirty in nature". Their dating relationship started in May 2014 which include sexual intrusion where Joseph digitally penetrated her vagina. The sexual relations with Joseph started in July 2014 which included Joseph inserting his penis into GM's vagina. This continued daily throughout the 2014-2015 school year. At the end of the school day, GM would walk out into the neighborhoods near Johnson Junior High School and wait for Joseph. Joseph would drive to the location and pick up GM. He would drive GM to his home at 1216 Alyssa Way where they would have sexual intercourse, and then he would drive GM home. This routine happened Monday through Friday throughout the 2014-2015 school year. GM said they would use excuses as running or bicycle riding when they were asked where they had been. During the summer of 2015 the sexual relations continued with Joseph as he was helping with GM's training for track and running. Their sexual relations continued throughout the 2015-2016 school year. In October 2015, Joseph and his wife Rebecca Meza (YOB 1983) were approached and asked by GM's biological mother,

35

Mandy Eaton (YOB 1977), about adopting GM. They started the adoption process for GM and she moved into their home on October 31, 2015. GM was officially adopted in May of 2016. GM said the sexual intercourse with Joseph continued after she moved into their home. Their last sexual encounter was the second week in April 2017.

6.    GM described the sexual intercourse with Joseph as vaginal, anal, and oral which occurred at Joseph's home located at 1216 Alyssa Way, Cheyenne, WY. GM said they had "sex" in the master bedroom, guest bedroom/her bedroom, bathroom, basement, her vehicle, and a house which was under construction in his neighborhood. The last time she had "sex" with Joseph was in her bed sometime during the first part of April 2017. GM wore lingerie during some of the sexual encounters. GM said she has not washed the bedding or the lingerie which was still in her bedroom. I asked GM if Joseph had anything on his body she could identify. GM said Joseph had a mole on the inside of his left thigh and he was circumcised.

7.    GM and Joseph exchanged text and instant messages with each other from the beginning of their relationship. The messaging would happen at all hours of the day for the three years. GM described the messages as "flirty in Nature" and they spoke of the sexual relations. GM said they would use code words which meant sexual activity. The code words were running, bicycling and boarding. GM showed me several of the messages on her cell phone. She advised her screen name was "Grassie2107" and Joseph's screen name was 'shootinstar0606". The messages I read were of a "flirty nature" and not what I expected from a father/daughter relationship. GM also said she had sent naked photographs of herself to Joseph. I seized GM's cellphone as evidence.

8.    On May 26, 2017, after speaking with GM, I spoke with Joseph Meza who arrived at the police department looking for GM. Joseph said he and GM were out to dinner. They had an argument and she left him at the restaurant. He learned through her new boyfriend's family that she was at the police department. Joseph said GM had started lying and becoming defiant towards him in the last couple of months. He believes it's because of her new boyfriend. Joseph just wanted to take GM and return home. I asked Joseph if I could look at his cellphone and he agreed. I noticed some of the same test messages of a "flirty nature". I explained to Joseph that I was going to seize the cellphone (Verizon Samsung Cell Phone 4G LTE Model #: SM-G900V IMEI#: 990004835280714) as evidence. I told him GM has accused him of having sexual intercourse with her for the past three years. Joseph requested an attorney and stopped the interview.

9.    On May 26, 2017, I spoke with Rebecca Meza. Rebecca said she has been married to Joseph for twelve years and they live at 1216 Alyssa Way. Rebecca said Joseph was a math teacher and track coach at Johnson Junior High School. She described his relationships with his students as close. He would help them any time he could. Joseph's relationship with GM started when she was having trouble in school. He was helping her deal with being a previous sexual assault victim. She had confided in him about the incident. Rebecca started helping GM when she learned GM didn't have any underwear. Rebecca took GM shopping for clothes. Joseph and Rebecca were approached by GM's mother, Mandy Eaton and asked about adopting GM. GM moved into their home for the guardianship period in October 2015, and they adopted GM in May 2016. Rebecca said there have been some issues with their marriage. She has slept on the couch for the past three years and has not had sexual relation with Joseph for the same time. They have attempted counseling to resolve the issues. Rebecca said she had no idea Joseph and GM were having sexual relations.

10.    On May 27, 2017 at approximately 0100 hours, I photographed GM's bedroom. I collected the bedding from GM's bed, and seven pieces of lingerie from GM's bedroom. GM said she had purchased some of the lingerie items and Joseph had purchased the black lace lingerie bed jacket. These items were logged into the police department's property room as evidence.

11.    On May 30, 2017, I met with Rebecca and GM at the police department. Rebecca said they had located several other cell phones and tablets at their home which GM and Joseph used. The cellphones and tablets were on Rebecca father's Verizon plan. She said two cellphones and one tablet were used by GM and the other cellphone (Verizon Cell Phone HTC 4G LTE Model #: HTC6435L) and tablet (Amazon Kindle Model #: D01400) was used by Joseph. Rebecca signed search waivers for the three cellphones and tablet used by GM.

12.    On June 5, 2017, Rebecca brought GM's vehicle (Ford Fusion Wyoming registration 2-7758C, VIN: 3FAH907ZX9R188547) to the police department for biological testing of the interior. Sergeant Hickerson used an alternative light source and located two locations of possible dried biological fluids. These locations were on the middle of the back seat, and on the left front corner of the front passenger seat. GM had told me she had oral sex with Joseph in the front seat and intercourse in the back seat. The samples of the biologicals were logged into the Cheyenne Police Evidence and requested to be sent to the Wyoming Stat Crime Lab for testing.

13. On June 5, 2017, Rebecca notified me about her father, Vince Garcia, being notified by Verizon about possible fraudulent activity on his account. Verizon had reset Vince's Verizon password because an unknown suspect was attempting to reset all of Vince's settings and passwords. Vince was not attempting to change his password. Rebecca also advised GM's passwords to her emails on Google have all been reset and she cannot get access. Rebecca said the only person who knows all of GM's email information to reset the password is Joseph.

14. On June 6, 2017, Detective Girany forensically imaged GM's tablet and located approximately 7300 messages from "shootingstar0606" to "Grassie2107" These messages, on the tablet, between GM and Joseph mention the sexual relationship they were having. One message was from Joseph to GM on August 12, 2015 at 1740 hours, states "Our Sex is so fn amazing".

15. On June 8, 2017, a forensic interview on GM was conducted at Safe Harbor. Lynn Hyler interviewed GM. GM substantially related the following: GM met Joseph Meza the beginning of her seventh-grade year at Johnson Junior High School's "Meet the teacher's night". GM liked Joseph because he was funny and made learning math fun. Their friendship began in December 2013, when Joseph learned from GM's friends that she was a victim of a sexual assault. Joseph spoke with GM's mother about assisting GM with her schoolwork and received her permission to call GM after school hours. Their relationship developed into a friendship spending time together after school and on weekends. In May 2014 Joseph asked GM if she would be interested in taking their friendship to the next level and start dating. GM liked this idea and told Joseph she would like to date him. GM described their relationship as boyfriend/girlfriend which included hugging and kissing. Their sexual relationship started over the next couple of months. In July 2014, GM had sex with Joseph for the first time. Joseph took GM to his house while his wife was at work. He would make GM lay on the floor of his vehicle while he checked the house for his wife. He would take GM into the guest bedroom and they would have sexual intercourse. GM said this would happened several times a week for the 2014 summer break and then continued into the 2014-2015 school year.

16. In 2015 GM's mother approached Joseph and Rebecca Meza and asked them to adopt GM. They started the adoption process and GM moved into their house on October 31, 2015. GM said her sexual relationship with Joseph continued after she moved into their home. They made the guest bedroom into her bedroom. GM said on a daily bases Joseph would wait until Rebecca was asleep and then he would sneak into her bedroom and have sex with her in her bed. The adoption was finalized in May 2016. GM said the sexual relation continued until April 2017. GM said their last sexual encounter was the first part of April 2017. GM wanted to stop the relationship because she had a new boyfriend in high school. GM and Joseph had a fight at the restaurant the night she reported it to the police.

17. During this interview GM stated she had traveled out of state with Joseph several times for vacation and races he attended. They traveled to Florida, Minneapolis, Minnesota, and Las Vegas, Nevada. GM said they had sexual intercourse at those locations. GM said on two separate occasions they traveled to Las Vegas, Nevada for half marathon races. They had sex each time they went to Las Vegas. The last time was in November 2016. GM said she had a Urinary Track Infection while on this last trip. When they returned Joseph took her to Americans Express Urgent Care for treatment and a pregnancy test.

18. On June 12. 2017, I reviewed the 7300 test messages Detective Girany recovered from GM's Tablet. These messages were from May 2014 to November 2014. The messages contained information about the sexual relationship between Joseph Meza and GM. Meza was GM's math teacher and running coach. In several of the messages GM told Joseph how she likes the sex she had with him. She asked Joseph if he is going to marry her in the future and Joseph replied "yes". Joseph's last two messages for each day reminds GM to take her pill and then tells her to "erase".

19. On June 12, 2017, I submitted three affidavits for search warrants for Joseph's two cell phones (Verizon Samsung Cell Phone 4G LTE Model #: SM-G900V IMEI#: 990004835280714; Verizon Cell Phone HTC 4G LTE Model #: HTC6435L) and his Kindle table (Amazon Kindle Model #: D01400). Judge Healy signed the warrants and I served the warrants on these devices the same day.

20. On June 29, 2017, Detective Girany located on Joseph Meza's Verizon cell phone, HTC 4G LTE Model #: HTC6435L, several photographs of a nude male and a topless female. The photographs of the female were taken in a bedroom with a bed in the background of the photographs. The bed in these photographs has the same type of bedding I had recovered from GM's bedroom on May 27, 2017.

21. On June 30, 2017, GM identified the topless female in the photographs located on Joseph Meza's Verizon cell phone, HTC 4G LTE Model #: HTC6435L as being her. These photographs show GM's breasts from several different angles. GM said she took these topless photographs of

herself with her cellphone and sent them to Joseph's cellphone because of their relationship. GM identified the naked male in the photographs on Joseph's cell phone as Joseph. She said the photograph of the male's penis was Joseph and even pointed out he was circumcised and the mole which was on the inside of his thigh. GM mentioned this mole during her interview on May 26, 2017.

22. Detective Girany located over 47,144 text messages on Joseph's Verizon cell phone, HTC 4G LTE Model #: HTC6435L, 17,275 are messages with GM. The messages start on January 16, 2014 and end on March 31, 2015. The content of these messages support GM's story. The messages start as a friendship between GM and Joseph and finish in a boyfriend/ girlfriend relationship.

23. On June 30, 2017, I obtained GM's medical records from the staff at Americans Express Urgent Care for GM's medical treatment on November 26, 2016. The medical treatment was for Dysuria (painful urination) and a pregnancy test. In the patient's history GM informed the medical staff that she has had the same sexual partner for the past three years and they always use a condom.

24. On July 5, 2017, I received verbal confirmation from the Wyoming State Crime Lab that they had located two samples which tested positive for male semen on the bed sheets collected from GM's bed.

25. In summary, GM, (YOB 2000) a seventeen year old female and Joseph Meza a 34-year-old male were having sexual intercourse from July 2014 to April 2017. Joseph Meza was GM's math teacher and track coach. Joseph Meza adopted GM in May 2016 and they continued their consensual sexual intercourse. GM's statements about their relationship has been consistent through the Officer's, Detective's, and Safe Harbor's interview. There are text messages on GM's tablet and Joseph Meza's cellphone that support their relationship. There were nude photographs of GM on Joseph Meza's cellphone. GM said she took them and sent them to Joseph because of their relationship.

26. The following is a timeline of GM's and Joseph Meza's sexual relations.

- From May 2014 to July 2014, GM a 14-year-old female was in a dating relationship which include sexual intrusion with Joseph Meza, a 31-year-old male. This sexual intrusion included Joseph Meza digital penetrated her vagina. Joseph Meza was GM's running club adviser.

- From July 2014 to August 2014, GM a 14-year-old female was having sexual intercourse with Joseph Meza, a 31-year-old male. This included Joseph Meza inserting his penis into GM's vagina. Joseph Meza was GM running club adviser during the school's summer vacation.

- From August 2014 to February 2015, GM a 14-year-old female was having sexual intercourse with Joseph Meza, a 31/32-year-old male. This included Joseph Meza inserting his penis into GM's vagina. Joseph Meza was her track coach and running club adviser.

- From February 2015 to June 2015, GM a 15-year-old female was having sexual intercourse with Joseph Meza, a 32-year-old male. This included Joseph Meza inserting his penis into GM's vagina. Joseph Meza was her track coach and running club adviser during the school year.

- From June 2015 to August 2015, GM a 15-year-old female was having sexual intercourse with Joseph Meza, a 31-year-old male. This included Joseph Meza inserting his penis into GM's vagina. Joseph Meza was GM running club adviser during the school's summer vacation.

- From August 2014 to October 2015, GM a 15-year-old female was having sexual intercourse with Joseph Meza, a 32-year-old male. This included Joseph Meza inserting his penis into GM's vagina. Joseph Meza was her track coach and running club adviser during the school year.

- From October 2015 to May 2016, GM a 15/16-year-old female was having sexual intercourse with Joseph Meza, a 32/33-year-old male. This included Joseph Meza inserting his penis into GM's vagina. Joseph Meza was GM's legal Guardian.



- From May 2016 to April 2017, GM a 16/17-year-old female was having sexual intercourse with Joseph Meza, a 33/34-year-old male. This included Joseph Meza inserting his penis into GM's vagina. Joseph Meza was GM's adopted father.

27. If the above facts are true, I believe there is probable cause to obtain an arrest warrant for Joseph Kent Meza.

**FURTHER YOUR** affiant saith naught.

**DATED THIS** 7th day of July, 2017.

_______________________ Affiant

Subscribed and sworn to before me this 7th day of July, 2017, by John C Pederson II .

_______________________ Notary Public

My Commission Expires: KRISTINA L. JONES - NOTARY PUBLIC COUNTY OF LARAMIE STATE OF WYOMING MY COMMISSION EXPIRES ... 24, 2018 

**EXHIBIT 20**

9:08
July 25, 2017
10:03 AM
Edit
Done
7 of 8
George Jankowski Y'all jumping all over this person without knowing everything. Aren't all people innocent until proven guilty? If it were your family member you'd be upset of everyone possibly falsely accusing them. Let the jury decide if they are guilty.
Like · Reply · 5 · July 14 at 11:36am
Eric Epler I would normally agree with you but this case immediately brought out people attacking the victim so sides were drawn pretty quickly and the cannon fire started.
Like · Reply · 2 · July 14 at 2:03pm
Misty Martinez
Like · Reply · July 15 at 9:18am
Kambria Cordova If this was my family member I would be ashamed of him. Allegations didn't come from no where. And it is sickening he is out on bond. Anybody who is charged with a crime like this is guilty til proven innocent in my eyes because no one else's children need to put in danger or looked at by this creep.
Like · Reply · 5 · July 15 at 10:22am
Write a reply...
Rocky Bolin If he faces 400 years in prison, how much probation will he get? If it was marijuana possession, he might actually get jail time.
Like · Reply · 8 · July 13 at 8:53pm
Erica Swopes Crimin If you want to get away with a crime legally kill or molest someone!
Like · Reply · 2 · July 14 at 8:19am
Matt Warner Do any crime ever and just claim mental illness, Scott free!
Like · Reply · July 14 at 11:48am
Write a reply...
Jeanne Wallace has any one else heard that the girl has accused other teachers at other schools?
Like · Reply · 1 · July 14 at 7:09am
Debbie Cairns sure haven't Jeanne but people point fingers too easy
Like · Reply · July 16 at 2:22pm
Ella Louise Two others, one went to prison.
Like · Reply · 36 mins